UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td></td><td></td></tr>
</table>

| | |
|---|---|
| ROTEM ROSEN, | |
| Plaintiff, | |
| v. | |
| ALEX SAPIR and 260-261 MADISON AVENUE JUNIOR MEZZANINE LLC, | |
| Defendants. | |

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 09/30/2021

No. 20-cv-5844 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Rotem Rosen brings this action against his former business partner and former brother-in-law, Alex Sapir, and against 260-261 Madison Avenue Junior Mezzanine LLC ("260-261 Madison"), a company of which Alex Sapir is a member (collectively, "Defendants"). Rosen seeks declaratory judgment that Sapir is in default of a binding letter of intent and promissory note; he also alleges that Sapir violated multiple contractual obligations and publicly defamed him. Defendants have moved to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the reasons that follow, the motion is granted in part and denied in part.

## BACKGROUND

### I.    Factual Background

The following facts are drawn from Plaintiff's Complaint, Dkt. 1 ("Compl.") and exhibits attached to the Complaint, and are assumed to be true for the purposes of resolving this motion.

*See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 33 (2d Cir. 2017) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

### A.      The Letter of Intent and Promissory Note

Rotem Rosen and Alex Sapir are former brothers-in-law and former business associates who partnered in various real estate enterprises together.  Compl. ¶¶ 23-25.  A "key asset[]" of one of these partnerships was "100% of the controlling class membership interest in another entity, Defendant 260-261 Madison"; 260-261 Madison is an LLC that, in turn, owns two commercial buildings ("the Madison Property").  Compl. ¶ 25.  Sapir remains a member of 260-261 Madison.  *Id.* ¶ 19.

Sapir and Rosen eventually made a "mutual decision to separate certain jointly held assets" and end their business relationship.  *Id.* ¶ 3.  They documented the terms of their separation in a Letter of Intent dated June 21, 2017 ("LOI").  *Id.*  Under the LOI, Sapir purchased Rosen's interests in certain assets for approximately $75 million ("the purchase price").  *Id.* ¶ 4.  Sapir made an initial payment of $15 million and executed a promissory note ("the Note") undertaking to pay Rosen the remaining $60,456,308 in installments over the next 15 years.  *Id.*  Sapir's debt was guaranteed by 260-261 Madison.  *Id.* ¶ 6.  As a further means of security, Sapir signed a Confession of Judgment, which would purportedly authorize judgment against him if he defaulted on the Note.  *Id.* ¶ 27.

The LOI and Note describe certain events that constitute default and render the full outstanding amount of the Note immediately payable ("event of default").  *Id.* ¶ 5.  One such event of default occurs if Sapir "engage[s] in refinancing of a debt and/or line of credit debt on commercial real properties indirectly owned by 260-261 Madison and/or on the ownership

structures of those real properties above a certain threshold." *Id.* ¶ 7.  Specifically, the LOI provides that:

> Upon the occurrence of any of the following, upon notice from [Rosen] all of the unpaid Purchase Price (or any portion thereof), and all other amounts owing or payable hereunder, shall be immediately due and payable, without presentment, demand, protest or other notice of any kind . . . (ii) a refinancing of indebtedness and/or line of credit on the [Madison Property] in an aggregate amount that exceeds the aggregate outstanding principal amount of the existing indebtedness and line of credit as of the date of this Letter that is being refinanced, together with any interest which is accrued and/or capitalized therein, by more than $500,000.

Dkt. 1-1 at 5 ("the refinancing provision").  Rosen alleges that, as of the date of the LOI, the only debt on the Madison Property was a $30 million line of credit facility that had a total outstanding amount of $17,200,000.  Compl. ¶ 30.

The Note further provides that certain actions constitute an administrative default; if, upon notice, an administrative default is not cured within five days, it becomes an event of default and Sapir's debt under the Note becomes immediately payable. *Id.* ¶¶ 33-34.  An administrative default occurs upon "any breach or other default of the terms of [the LOI] and/or any other document entered into in respect of" the transactions that Rosen and Sapir agreed to in the LOI; these documents are referred to as the "Transaction Documents."  Dkt. 1-1 at 5; Compl. ¶ 35.  One of those Transaction Documents is a Mutual Release that Rosen and Sapir executed on March 8, 2018.  Compl. ¶ 36; Dkt. 1-1 at 6 (LOI incorporating this document by stating that "the parties hereto will execute mutual general releases").  Under the terms of that Release, Rosen and Sapir released all claims and potential claims against each other that they had as of March 8, 2018, whether known or unknown, and covenanted not to sue each other on those claims.  Compl. ¶¶ 14, 37, 39; Dkt. 1-4.  Specifically, the Release provides that

> each Party hereunder [including Rosen and Sapir] . . . hereby releases and discharges all other Parties and Affiliated Parties from all actions, causes of

> action, [or] suits . . . whether known or unknown, whether foreseen or unforeseen (regardless of by whom raised), whether asserted or unasserted, whether contingent or vested, whether choate or inchoate, whether in contract, tort or otherwise, whether past, present or future, whether liquidated or unliquidated, whether fixed or unfixed, whether direct or derivative, whether matured or unmatured, whether suspected or unsuspected, and/or whether or not concealed, sealed, or hidden which each Party and/or the Affiliated Parties ever had, now has or hereafter can, shall or may have (collectively, the "Claims"), arising out of or relating to the Assets and/or the Parties' interests therein and/or to any Claims relating to Rosen's affiliation with any entity controlled or managed (in whole or in part) by or affiliated with Sapir, ASRR Capital Ltd. and/or the Companies or any of the respective affiliates of each of the foregoing entities from the beginning of the world to the day of the date of this Mutual Release.

Compl. ¶ 37; Dkt. 1-4 at 2-3.  The Release also documents the parties' agreement that "in the event of a dispute regarding this Mutual Release, a Court should interpret the releases contained herein as broadly as possible."  Dkt. 1-4 at 3.

Finally, the LOI contains a non-disparagement provision, which states:

> The parties hereto shall not, and shall cause his or its respective affiliates not to, directly, in any public statement to the press or other media or in any interviews with the press or other media make any statement which is intended to disparage, defame or slander, the other party or such party's business, any of such party's subsidiaries or affiliates . . .

Compl. ¶ 40; Dkt. 1-1 at 6.  The provision goes on, however, to establish a carveout for good-faith statements made in the course of any lawsuit:

> . . . provided, however, that the foregoing provisions shall not apply to any non-libelous and non-slanderous statements or other actions taken or made with respect to any party or any such party's subsidiaries or affiliates in good faith in connection with any lawsuit, arbitration or other proceeding, action or claim to which such party is subject or which is threatened in writing or pending before any court, arbitrator, tribunal or other governmental or regulatory authority.

Compl. ¶ 40; Dkt. 1-1 at 6.

### B.    Sapir's Alleged Event of Default Based on the Refinancing Provision

In June 2020, Rosen learned from publicly available filings that Sapir had refinanced the line of credit on the Madison Property.  Rosen alleges he became concerned that an event of

4

default had occurred under the LOI pursuant to the refinancing provision.  Compl. ¶¶ 9, 45-48.

Through his counsel, Rosen contacted Sapir or Sapir's counsel three times over three weeks,

requesting documentation about the specifics of the refinancing to determine if such a default

had occurred.  *Id.* ¶¶ 10, 49, 51, 53.  Through his own counsel, Sapir represented that no event of

default had occurred—but refused to offer any further information or documentation about the

refinancing, including its amount, and instead took the position that no obligation to share such

information existed in the LOI or the Note.  Dkt. 1-7 ("To be clear, no event of default has

occurred under the Promissory Note or the Binding LOI . . . .  Moreover, our client has no

obligation under the Binding LOI, the Promissory Note, or otherwise to provide Rotem Rosen

('Rosen') with the documents demanded in the Letter.").  Rosen proposed that Sapir provide the

information under a confidentiality agreement, on an "attorneys' eyes only" basis, or simply

answer "yes" or "no" as to whether the refinancing was in an amount that triggered a default

under the refinancing provision.  Sapir rejected each proposal.  Compl. ¶¶ 11, 50-54; Dkts. 1-8,

1-9, 1-10, 1-11.  According to Rosen, Sapir refused to provide this information in order "to

conceal [his] Refinancing Default."  Compl. ¶ 57.

### C.     Sapir's Alleged Event of Default Based on the Mutual Release, Alleged Defamation, and Alleged Violation of the Non-Disparagement Provision

This lawsuit is only one of numerous legal and personal disputes between the parties.  In

the first step of what Rosen describes as "a scorched earth campaign of slander, threats and

personal destruction," *id.* ¶ 58, Sapir (joined by other plaintiffs) filed a complaint of his own

against Rosen in July 2020 ("the Sapir Complaint").  Therein, he alleged that Rosen had, among

other things, misappropriated confidential information or trade secrets owned by Sapir and his affiliates. *Id.* ¶ 13.[1]

Although the Complaint's description of the Sapir Complaint largely functions as an attempt to challenge the merits of that separate action, Rosen does make one relevant allegation: that the Sapir Complaint's misappropriation claims against Rosen are based on events that allegedly occurred before March 8, 2018 and are thus barred by the Release. Accordingly, he asserts, the Sapir Complaint triggered an administrative default under the LOI. *Id.* ¶¶ 14, 66.

Pursuant to this theory, Rosen's counsel served Sapir and his counsel with a Notice of Administrative Default. The notice explained that Sapir's misappropriation claims constituted an administrative default and warned that if Sapir did not cure the default within five days by withdrawing or dismissing the suit, the administrative default would become an event of default. *Id.* ¶ 68. Sapir's counsel denied that the Sapir Complaint violated the Release—but nonetheless filed a "corrected" complaint that added a clause purporting to clarify that Sapir sought relief only for Rosen's "post-Mutual Release" conduct. *Id.* ¶¶ 69-70; Dkt. 1-12 at 4; Dkt. 1-16 at 4. Rosen maintains that this correction did not cure the administrative default, and that as a result, the administrative default became an event of default rendering Sapir's debt immediately payable. Compl. ¶¶ 71-72.[2]

---

[1] That lawsuit is also pending before this Court, and an opinion on the motions to dismiss that case is being released simultaneously with this one. *See Alex Sapir et al. v. Rotem Rosen et al.*, No. 20-cv-6191.

[2] The LOI and the Note appear to be inconsistent on the consequences of a breach of the terms of the LOI and/or any Transaction Document as alleged here. Specifically, while the Note explains that any such breach is an administrative default—and therefore does not become an event of default that renders Sapir's debt immediately payable unless it goes uncured for five business days—the LOI characterizes the same breach as rendering Sapir's debt immediately payable upon notice from Rosen, without the requisite five-day period. *Compare* Dkt. 1-2 at 5-6, *with* Dkt. 1-1 at 5. Because Rosen alleges that the administrative default here went uncured and thus became an event of default, the Court need not resolve this ambiguity.

According to Rosen, the Sapir Complaint caused yet another contractual breach. "Within hours" of the suit being filed, media outlets began carrying stories based on the litigation. *Id.* ¶ 75. One such story quoted a statement circulated to the media by Sapir's counsel, which read:

> As the complaint alleges, for over a decade, Rotem Rosen rode the Sapir Organization's coattails, taking advantage of the Sapirs' trust and generosity to siphon tens of millions of dollars, misappropriate proprietary information, and violate the contractual terms of his ouster from the Sapir family and its business . . . This action seeks to hold the Rosens accountable for their many alleged misdeeds . . . Both Rotem and his brother Omer, who allegedly conspired with him, have repaid our client's trust with betrayal and mistaken its kindness for weakness.

*Id.* ¶ 77. Rosen alleges that this statement "contains false, defamatory, and disparaging statements" and is "neither a fair nor true report of" the Sapir Complaint because the Sapir Complaint does not allege that Rosen dishonestly took tens of millions of dollars from the Sapir Organization or from Sapir. *Id.* ¶¶ 81-83. Accordingly, he asserts, this statement both (1) subjects Sapir to liability for common-law defamation; and (2) constitutes disparagement in breach of the LOI's non-disparagement provision—one that is not subject to the carveout regarding litigation statements because of its libelous character and bad faith.

## II.   Procedural Background

Plaintiff filed the Complaint in this action on July 28, 2020. Dkt. 1. On September 18, 2020, Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. 12. Plaintiff filed his opposition on October 23, 2020, Dkt. 30, and Defendants filed their reply on November 6, 2020, Dkt. 32. The parties also subsequently submitted sur-reply memoranda regarding the doctrine of *contra proferentem*. Dkts. 33, 35.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged," *id.*; claims that are merely "conceivable"

or "consistent with" liability are insufficient, *Twombly*, 550 U.S. at 545, 570.  In evaluating a

motion to dismiss under Rule 12(b)(6), a court must "accept as true all factual statements alleged

in the complaint and draw all reasonable inferences in favor of the non-moving party." *Vietnam

Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008).  The

Court need not, however, credit "threadbare recitals of the elements of the cause of action,

supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.[3]

Given that all parties rely on New York law throughout their briefs, the Court applies

New York law to Plaintiff's claims.  *See Arch Ins. v. Precision Stone*, 584 F.3d 33, 39 (2d Cir.

2009).[4]

## DISCUSSION

Plaintiff brings six claims based on the conduct described above: (1) a claim for

declaratory judgment that an event of default has occurred pursuant to the refinancing provision,

and that Plaintiff is thus entitled to payment of the full accelerated unpaid portion of the purchase

price; (2) a claim for declaratory judgment that an administrative default and subsequent event of

default has occurred based on Sapir's violation of the Release, and that Plaintiff is thus entitled

to payment of the full accelerated unpaid portion of the purchase price; (3) a claim for violation

of the covenant of good faith and fair dealing based on Sapir's refusal to disclose the refinancing

---

[3] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

[4] Both the LOI and the Note contain a New York choice of law provision.  Dkt. 1-1 at 6; Dkt. 1-2 at 13.  This provides another basis for the Court to apply New York law to Plaintiff's claims.  *See 19 Recordings Ltd. v. Sony Music Ent.*, 97 F. Supp. 3d 433, 438 n.4 (S.D.N.Y. 2015).

amount to Plaintiff; (4) a claim for breach of the Release based on the filing of the Sapir

Complaint; (5) a claim for breach of the LOI's non-disparagement provision based on Sapir's

counsel's press statement describing the Sapir Complaint; and (6) a claim for defamation based

on that same statement.  Compl. ¶¶ 90-130.  The Court addresses each claim in turn.

## I. Plaintiff States a Claim for Declaratory Judgment that a Refinancing Default Has Occurred

Plaintiff first seeks declaratory judgment that an event of default has occurred pursuant to

the refinancing provision (a "refinancing default").  "A motion to dismiss a declaratory

judgment action prior to the service of an answer presents for consideration only the issue of

whether a cause of action for declaratory relief is set forth, not the question of whether the

plaintiff is entitled to a favorable declaration."  *Bregman v East Ramapo Cent. Sch. Dist.*, 122

A.D.3d 656, 657 (N.Y. App. Div. 2014).  Therefore, the Court considers whether the allegations

concerning the refinancing of the $30 million line of credit on the Madison Property, along with

Defendants' refusal to disclose the amount of that purported refinancing, plausibly raise the

inference that a refinancing default has occurred.

Under the LOI, the threshold of refinancing that triggers a refinancing default is:

> a refinancing of indebtedness and/or line of credit on the [Madison Property] in an
> aggregate amount that exceeds the aggregate outstanding principal amount of the
> existing indebtedness and line of credit as of the date of this [LOI] that is being
> refinanced, together with any interest which is accrued and/or capitalized therein,
> by more than $500,000.

Dkt. 1-1 at 5.  Plaintiff alleges that, pursuant to this provision, any refinancing of the $30 million

line of credit on the Madison Property in an amount greater than $17,700,000 triggers a

refinancing default.  Compl. ¶ 53.  Defendants urge otherwise.  They first argue that the "line of

credit" portion of this equation comes out to $30 million—the limit of the credit line—not

$17,200,000—the total outstanding amount of that credit line—because the phrase "outstanding

principal amount" modifies only the phrase "existing indebtedness."  MTD at 16.  Defendants

further assert that the Madison Property is encumbered not only by that $30 million line of

credit, but also by a $231 million mortgage.  MTD at 6 n.8, 14 (citing filings from the Automated

City Register Information System); *United States v. Nassar*, No. 13 Civ. 8174 (ER), 2014 U.S.

Dist. LEXIS 158520, at *26 n.11 (S.D.N.Y. Nov. 10, 2014) (taking judicial notice of documents

filed on this database).  They treat this mortgage as an "existing indebtedness" on the Madison

Property that must be factored into the calculation for a refinancing default.  Thus, under

Defendants' interpretation, the threshold for a refinancing default would presumably be

approximately $261,500,000—that is, the entirety of the $231 million mortgage debt, plus the

$30 million credit line limit, plus $500,000 (and any interest that might have accrued or

capitalized).

　　　　Plaintiff challenges both aspects of this interpretation.  He contends that the phrase

"outstanding principal amount" modifies "line of credit" in addition to "existing indebtedness,"

meaning that the $17,200,000 outstanding principal on the line of credit—not its $30 million

limit—is the correct number to attach to "line of credit."  He further argues, citing a free writing

prospectus publicly filed on the SEC's website, that the $231 million mortgage debt

encumbering the Madison Property is an interest-only loan, and therefore has no "principal

amount" to contribute to the equation.  MTD Opp. at 12-14; Dkt. 31-2 at 6 (free writing

prospectus describing "interest only payments for the term of the loan"); *Kramer v. Time Warner

Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("A district court may take judicial notice of the contents

of relevant public disclosure documents required to be filed with the SEC.").  Accordingly, he

concludes, the threshold for a refinancing default is $17,700,000—that is, the $17,200,000

principal on the line of credit, plus $500,000 (and any interest that might have accrued or capitalized).  MTD Opp. at 6.

A refinancing has been defined as "an exchange of an old debt for a new debt, [such] as by negotiating a different interest rate or term or by repaying the existing loan with money acquired from a new loan."  *Carlton Grp. Ltd. v. Mirabella SG SpA*, No. 16 Civ. 6649 (LGS), 2018 WL 3520494, at *6 (S.D.N.Y. July 19, 2018) (citing *Black's Law Dictionary*).  With that in mind, the Court considers the implications of both parties' interpretations.  Plaintiff's interpretation that a default occurs when the Madison Property line of credit is refinanced in an amount that exceeds $17,700,000 makes plausible his claim that a refinancing default occurred here—particularly in conjunction with Defendants' refusal to disclose the amount of the refinancing.  His claim becomes less plausible if a refinancing default occurs only if the credit line is refinanced in an amount that exceeds $261,500,000.

Accordingly, the Court must decide whether the refinancing provision's plain meaning supports one party's interpretation—or whether it is ambiguous.  "At the motion to dismiss stage, a district court may dismiss a . . . claim only if the terms of the contract are unambiguous. . . . whether or not a writing is ambiguous is a question of law to be resolved by the courts."  *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016).  "A contract is ambiguous under New York law if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Id.* at 156-57.  By contrast, "a contract is unambiguous . . . if the contract language has a definite and precise meaning and concerning which there is no reasonable basis for a difference of opinion."  *Id.* at

157.  The Court concludes that the refinancing provision is, at the very least, ambiguous, barring dismissal of Plaintiff's claim at this stage based on the provision's meaning.

The parties' disagreement is perhaps unsurprising, given the quality of drafting at issue. Although Plaintiff's reading of the refinancing provision is arguably more persuasive than Defendants', the provision is in any event ambiguous in that it is susceptible to multiple reasonable interpretations.  As an initial matter, the Court questions whether the $231 million mortgage debt—regardless of what its outstanding principal amount was on the date of the LOI—is even relevant to calculating the refinancing default threshold, because it is not an "existing indebtedness and line of credit" *that is "being refinanced."*  That is, one plausible reading of the refinancing provision is that for the clause "that is being refinanced" to have any meaning, it must modify the phrase "existing indebtedness and line of credit."  *See Orchard Hill*, 830 F.3d at 157 ("A contract should be construed so as to give full meaning and effect to all of its provisions.").  Nor is the Court persuaded that the clause "that is being refinanced" must be read to modify only the phrase "line of credit," given that the opening words of the refinancing provision contemplate the possibility of either an indebtedness *or* a line of credit being refinanced.  This suggests that "aggregate outstanding principal amount of the existing indebtedness and line of credit" could refer only to that indebtedness and line of credit that is being refinanced—which would remove the $231 million mortgage from the calculation in this situation.

Moreover, Defendants' reliance on the total limit of the line of credit appears to be in tension with the language of the refinancing provision.  The refinancing provision describes the "aggregate outstanding principal amount of the existing indebtedness and line of credit"—not the total amounts of such indebtedness and lines of credit.  Defendants would have "outstanding

principal balance" apply only to the term "existing indebtedness," and not to "and line of credit."
Perhaps if the word "the" preceded "line of credit," Defendants' reading might carry the day.
But the absence of an article suggests that the modifier "aggregate outstanding principal amount
of" could apply both "indebtedness" and "line of credit."  And the Court must credit Plaintiff's
allegation that the line of credit had a "total outstanding amount" of $17,200,000.  Compl. ¶ 30.

In sum, even taking Defendants' interpretation of the refinancing provision to be
reasonable, a competing interpretation is reasonable as well, making the refinancing provision
ambiguous.  This conclusion renders plausible Plaintiff's allegation that a refinancing default
occurred.

Defendants also challenge this outcome by arguing that Plaintiff is on a speculative
fishing expedition to determine whether such a default *may* have occurred.  MTD at 18-19.  To
be sure, had Plaintiff's facts been limited to the fact of refinancing, his claim may have been
merely "consistent with" liability.  *Twombly*, 550 U.S. at 545.  But Plaintiff also asserts that
Defendants repeatedly refused to provide any information regarding the amount of that
refinancing, citing no reason other than the lack of contractual obligation to do so.  While far
from a smoking gun, at this preliminary stage of the litigation, Defendants' behavior supports a
reasonable inference that they were concealing a refinancing default.  Plaintiff thus has stated a
claim on his first declaratory judgment action.

## II.     Plaintiff States a Claim for Breach of the Covenant of Good Faith and Fair Dealing

The Court next considers whether Defendants' alleged refusal to provide Plaintiff any
information about the refinancing, including whether it was in an amount that triggered an event

of default under the LOI, constitutes a breach of the implied covenant of good faith and fair dealing. Although a close question, Plaintiff states a claim.

"In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002). "This covenant is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." *P.T. & L. Contracting Corp. v. Trataros Constr., Inc.*, 29 A.D.3d 763, 764 (N.Y. App. Div. 2006). Encompassed within the covenant's obligations are "any promises which a reasonable person in the position of the promisee would be justified in understanding were included," *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995), as well as any "terms that the parties must have intended because they are necessary to give business efficacy," *Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*, 552 Fed. App'x 13, 16 (2d Cir. 2014).

As discussed above, drawing all reasonable inferences in the Complaint in the light most favorable to Plaintiff suggests that a refinancing default may have occurred. According to Plaintiff, Defendants not only "failed to advise" Plaintiff of this "critical development," but also thwarted his attempts to learn of it. District courts in this circuit have deemed behavior to of this sort to be violative of the implied covenant—even when the question that went unanswered was simply *whether* a failure to pay had occurred. *See Hexagon Sec. LLC v. Leawood Bancshares, Inc.*, No. 13 Civ. 907 (JSR), 2014 WL 1303516, at *5 (S.D.N.Y. Mar. 14, 2014) ("Because the complaint's allegations . . . suggest that . . . defendants intentionally avoided informing [plaintiff] that the restructuring had occurred and therefore that payment of the Success Fee . . . was now due, [plaintiff] has plausibly pleaded that [defendant] violated its implied pledge not to

14

injure [plaintiff's] right to receive the fruits of the contract."); *Melling v. Hamilton Point Invs., LLC*, No. 1:18-CV-3514 (ARR) (SMG), 2019 WL 235641, at *6 (E.D.N.Y. Jan. 16, 2019) (concluding that under Connecticut law, which mirrors New York law on the implied covenant, an allegation that the defendant "refused to disclose information" about whether and by how much it underpaid the plaintiff and did so in bad faith "is enough to make out a claim").

Notably, Plaintiff does not allege—and Defendants do not argue—that the precise amount by which the line of credit on the Madison Property was refinanced could be acquired by any means other than asking Defendants directly. Drawing all reasonable inferences in Plaintiff's favor thus compels the conclusion that Plaintiff cannot determine whether a refinancing default has occurred without obtaining that information from Defendants. This fact, if true, means that a reasonable person in Plaintiff's position would understand a promise of such disclosure to be inherent in the LOI's refinancing provision; otherwise, there would be no means by which he would be guaranteed to receive the benefits of the contract. The Court is also satisfied that, contrary to Defendants' argument, MTD at 21, Plaintiff has adequately pleaded that as a result of this breach, he was deprived of the fruits of the contract. Namely, Defendants have allegedly prevented Plaintiff from collecting the debt he is purportedly owed. *Cf. Grewal v. Cuneo*, No. 13-CV-6836 (RA), 2015 WL 4103660, at *11 (S.D.N.Y. July 7, 2015), *aff'd*, 803 Fed. App'x 457 (2d Cir. 2020) ("To prove the [breach of implied covenant claim], Plaintiff will need to demonstrate that . . . [Defendant] failed to pay Plaintiff a percentage of any such fees as required pursuant to the plain terms of her employment agreement.").

Accordingly, Plaintiff has stated a claim for breach of the implied covenant.

**III.    Plaintiff's Declaratory Judgment Claim and Breach of Contract Claim Based on Breach of the Release Are Dismissed**

Plaintiff next alleges that Sapir breached the Release—and correspondingly defaulted under the LOI—by bringing misappropriation claims against Plaintiff under both common law and the federal Defend Trade Secrets Act, Dkt. 1-16 at 29, based on conduct that allegedly occurred prior to March 8, 2018.  Defendants argue that the Sapir Complaint's claims against Plaintiff are all based on conduct that post-dates the Release.  The Court agrees with Defendants.

The Sapir Complaint seeks relief for "the post-Mutual Release use by Rotem of [Sapir's] confidential, proprietary and trade secret information"; it supports this allegation with descriptions of specific action Plaintiff allegedly took in June 2018, November 2018, and March 2019.  Dkt. 1-16 at 4, 18-20.[5]  Therefore, Defendants contend, Sapir's claims against Plaintiff clearly arise at least in part from post-Release conduct.  MTD at 11-13.  In response, Plaintiff draws the Court's attention to the assertion in the Sapir Complaint that in June 2017, Plaintiff's brother "Omer, inevitably in collaboration with Rotem, misappropriated, converted and stole [Sapir's] Proprietary Information."  Dkt. 1-16 at 12, 14.[6]  The natural meaning of this language, Plaintiff maintains, is that the misappropriation claims arise at least in part from Omer's June

---

[5] The specific allegations read: (1) "In June 2018, MRR acquired an option to purchase a development site in Miami located across the street from the Sapir Organization's development site located at 210 NE 18th Street.  Upon information and belief, Rotem improperly utilized the Sapir Organization's Proprietary Information to evaluate the development site, potential deal and financing terms, and construction and development methods, and began negotiating the acquisition of this sibling property."; (2) "Upon information and belief, Rotem, once again improperly used confidential Sapir Organization information to his benefit and the benefit of his new partners, purchasing, in November 2018 through MRR, the Hotel Indigo, which is approximately 10 minutes away from, and directly competes with, the NoMo SoHo Hotel owned by a Sapir Organization entity."; (3) "[I]n March 2019, while on 'vacation' out of the country, Omer requested that his assistant at the Sapir Organization send him an operating agreement draft and correspondence containing negotiations with [a] developer, notwithstanding the fact that the proposed joint venture transaction had been canceled almost 2 years prior.  Omer's assistant complied with his instructions, then deleted the email from her sent items folder.  One month later, Rotem, through MRR, closed a joint venture with this same developer."  Dkt. 1-16 at 18-20.

[6] Plaintiff further argues that any misappropriation claims based on post-Release conduct would be meritless, MTD Opp. at 20—but this contention is irrelevant to whether the claims in the Sapir Complaint are in fact based on post-Release conduct.

2017 act because Plaintiff was alleged to have collaborated in it.  MTD Opp. at 19-20.

Defendants counter that the word "inevitably"—which they appear to treat as synonymous with

"eventually"—makes clear that this statement does not describe Plaintiff's contemporaneous

conduct, only his later conduct.  MTD Reply at 2.

The language of the Release is exceptionally broad—and far from a model of clarity.  It

states, in relevant part, that

> each Party hereunder [including Sapir] . . . hereby releases and discharges all
> other Parties [including Plaintiff] . . . from all actions . . . which each Party . . .
> ever had, now has or hereafter can, shall or may have (collectively, the "Claims"),
> arising out of or relating to the Assets and/or the Parties' interests therein and/or
> to any Claims relating to Rosen's affiliation with any entity controlled or
> managed (in whole or in part) by or affiliated with Sapir, ASRR Capital Ltd.
> and/or the Companies or any of the respective affiliates of each of the foregoing
> entities from the beginning of the world to the day of the date of this Mutual
> Release.

Dkt. 1-4 at 2-3.  The parties do not dispute whether the misappropriation claims "relat[e] to"

Plaintiff's affiliation with Sapir or his affiliates.  Nor would such an argument have merit.  "The

term 'related to' is typically defined more broadly [than 'arising out of'] and is not necessarily

tied to the concept of a causal connection."  *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241

F.3d 123, 128 (2d Cir. 2001).  The phrase has been equated to "the phrases 'in connection with'

and 'associated with,' and synonymous with the phrases 'with respect to' and 'with reference

to.'"  *In re Optimal U.S. Litig.*, 813 F. Supp. 2d 351, 367 (S.D.N.Y. 2011).  The misappropriation

claims plainly relate to Sapir and his affiliates, as they are the purported owners of the

information that was misappropriated.  Dkt. 1-16 at 28.  Thus, the only question is whether the

Sapir Complaint raises misappropriation claims that Sapir allegedly had against Rosen as of the

date of the Release.

The Court concludes that it does not, because no pre-Release conduct by Plaintiff is pleaded as an essential element of the misappropriation claims.  In other words, even if the phrase "inevitably in collaboration with Rotem" were struck from the Sapir Complaint, it would still state the same misappropriation claims against Plaintiff.  It is true that, reading the Sapir Complaint in Plaintiff's favor, it suggests some sort of agreement or collaboration between Plaintiff and his brother as early as 2017—but it does no more than that.  Instead, in the Court's view, the Sapir Complaint alleges that it is only Plaintiff's post-Release conduct that constituted misappropriation for purposes of both the DTSA and common law.  *See E.J. Brooks Co. v. Cambridge Sec. Seals*, 105 N.E.3d 301, 310 (N.Y. 2018) (explaining that under New York law, a plaintiff claiming misappropriation of trade secrets must prove that the "defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means"); 18 U.S.C. § 1839(5)(A)-(B) (stating that misappropriation under the DTSA can be established by "disclosure" or "use" of a trade secret by a person who, "at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or . . . derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret").[7]

In sum, the misappropriation claims that are raised in the Sapir Complaint against Plaintiff are not barred by the Release because Defendants did not have them, whether known or

---

[7] Sapir *could* have brought a claim against Plaintiff that alleged Plaintiff committed misappropriation under the DTSA solely by virtue of acquiring alleged trade secrets from Omer in June 2017, *see* 18 U.S.C. § 1839(5)(A) (stating that improper acquisition can constitute misappropriation); such a claim would likely have been barred by the Release because Sapir would have had the claim available on March 8, 2018 (even if it was unknown as of that date).  Critically, though, the actual claims in the Sapir Complaint rely exclusively on Plaintiff's post-Release conduct.

unknown, in March of 2018.  Accordingly, the Court dismisses Plaintiff's claims for declaratory

judgment and for breach of contract based on the Release.

IV.    **Plaintiff's Claims for Defamation and Breach of the Non-Disparagement Provision Are Dismissed**

Lastly, Plaintiff challenges the press statement issued by Defendants' attorneys in

connection with the Sapir Complaint ("the press statement").  He contends that the press

statement—specifically, its assertion that "for over a decade, Rotem Rosen rode the Sapir

Organization's coattails, taking advantage of the Sapirs' trust and generosity to siphon tens of

millions of dollars"—constitutes common-law defamation and violates the terms of the LOI's

non-disparagement provision.  Compl. ¶ 77.  The Court disagrees on both fronts.

"Defamation is the injury to one's reputation either by written expression, which is libel,

or by oral expression, which is slander."  *Wexler v. Allegion (UK) Ltd.*, 374 F. Supp. 3d 302, 310

(S.D.N.Y. 2019).  To state a claim for defamation, a plaintiff must allege "(1) a false statement

that is (2) published to a third party (3) without privilege or authorization, and that (4) causes

harm."  *Stepanov v. Dow Jones & Co., Inc.*, 120 A.D.3d 28, 34 (N.Y. App. Div. 2014).  But

"New York Civil Rights Law § 74 . . . prohibits civil actions against any person, firm or

corporation, for the publication of a fair and true report of any judicial proceeding"—including

actions for defamation.  *Tacopina v. O'Keeffe*, 645 Fed. App'x 7, 8 (2d Cir. 2016); *see* N.Y. Civ.

R. § 74.  "A publication is deemed fair and true if it is substantially accurate."  *Karedes v.

Ackerley Grp., Inc.*, 423 F.3d 107, 119 (2d Cir. 2005).  And "a report is substantially accurate if,

despite minor inaccuracies, it does not produce a different effect on a reader than would a report

containing the precise truth."  *Id.*  It follows that section 74 offers no protection if the challenged

statements, in context, "suggest more serious conduct than that actually suggested in the official

proceeding." *Id.*  The Court thus considers whether, under these standards, the press statement is a fair and true account of the Sapir Complaint.

Plaintiff primarily objects to the press statement's use of the term "siphon."  Relying on various dictionaries and on foreign news outlets' translations of the press statement, he contends that "siphoning" denotes conduct far more egregious than that of which he was accused in the Sapir Complaint.  MTD Opp. at 23-24.  Defendants respond that the language used in the Sapir Complaint describes conduct similar enough to siphoning that the press release is substantially accurate.  MTD at 22-23.

Reviewing the press statement in its entirety, the Court concludes that its use of the term "siphon" does not accuse Plaintiff of conduct more serious than that described in the Sapir Complaint.  "When determining whether an article constitutes a fair and true report, the language used therein should not be dissected and analyzed with a lexicographer's precision." *Tacopina*, 645 Fed. App'x at 8.  Even if the Court adopts Plaintiff's preferred dictionary definition of "siphon"—"to take money, especially dishonestly, and use it for a purpose which was not intended"—it finds that the Sapir Complaint alleges essentially this conduct.  Dkt. 1-16 at 7 ("[Plaintiff] . . . approach[ed] Alex's father, Tamir, and convince[ed] him that his new partnership with Alex, ASRR, should be paid additional compensation for restructuring work that he and Alex performed over the past two years, notwithstanding that [Plaintiff] had already been paid for his services through DZR Corp."); *id.* at 3 ("[Plaintiff] fil[ed] a frivolous claim against the estate of Alex's father for $103 Million in an attempt to further enrich himself at the expense of the Sapir family."); *id.* (describing "a $75 Million buyout [Plaintiff] extracted from Alex [Sapir]" in exchange for relinquishing his interest in jointly held assets and companies).

Moreover, the very news story Plaintiff cites is persuasive evidence that the words "extracted" and "siphoned" (the former of which is used in the Sapir Complaint) are considered substantially equivalent by most readers.  *See* Dkt. 1-17 at 2-3 (Bloomberg article stating that "Sapir alleges that Rosen extracted tens of millions from his real estate company" and immediately following this sentence with a quotation of the press statement).  Nor is the Court persuaded that, by using the word "siphon," the press statement effectively accused Plaintiff of larceny or embezzlement; not all dishonest and inappropriate uses of money rise to the level of these crimes.[8]  In short, the press statement does not leave the public with a substantially different impression of Plaintiff's alleged conduct than does the Sapir Complaint, notwithstanding its arguably "more colorful" language.  *Geiger v. Town of Greece*, 311 Fed. App'x 413, 417 (2d Cir. 2009).  *See Wexler*, 374 F. Supp. at 312 (concluding that statements that defendants were "predators" was a fair and true report of a complaint alleging defendants' violation of professional decency standards, dishonorable behavior, and spreading of falsehoods to rob the plaintiff of his career).

Finally, the parties dispute whether Plaintiff's claim for breach of the non-disparagement provision may lie notwithstanding section 74's prohibition on defamation claims.  At least one district court in this circuit has concluded that "because section 74 confers an absolute privilege . . . statements privileged by section 74 may not create liability for breach of a non-disparagement clause."  *Id.* at 314.  In reaching its decision, the court in *Wexler* observed (1) that the Second Circuit has described section 74 as "grant[ing] absolute immunity to the publisher of a true report of a New York state court judicial opinion, whether the reporter is classified as

---

[8] That an Israeli newspaper once translated "siphon" into a word that means "embezzlement," Compl. ¶¶ 79-80, does not persuade the Court otherwise.

official or unofficial," *Beary v. West Pub. Co.*, 763 F.2d 66, 69 (2d Cir. 1985); and (2) that New

York courts have held that other absolute privileges from defamation bar claims for breach of

non-disparagement clauses based on such statements, *Arts4All, Ltd. v. Hancock*, 5 A.D.3d 106,

108 (N.Y. App. Div. 2004).  The Court is persuaded by *Wexler*'s reasoning.[9]  Accordingly,

Plaintiff's fifth and sixth claims are dismissed.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion

to dismiss.  Plaintiff may proceed with his first and third causes of action.  The Clerk of Court is

respectfully directed to terminate the item at docket number 12.


SO ORDERED.

Dated:          September 30, 2021
                New York, New York

_____
Ronnie Abrams
United States District Judge

---

[9] Moreover, under New York law, a contractual waiver of statutory rights must be "clear, unmistakable and without
ambiguity." *County of Erie v. State*, 14 A.D.3d 14, 17 (N.Y. App. Div. 2004).  There is no such clear waiver here,
particularly because the litigation carveout to the non-disparagement provision is so similar to the scope of section
74 immunity that it is unclear whether the parties intended that carveout to mirror section 74.  *See* Compl. ¶ 40; Dkt.
1-1 at 6; *see also Wexler*, 374 F. Supp. 3d at 314 n.11 (similarly reasoning that a non-disparagement clause did not
waive section 74 protection when the parties' contract did not mention section 74).