# EXHIBIT 1

## ASRR, LLC
## OPERATING AGREEMENT

This Operating Agreement (the "Agreement") is entered into as of the 7th day of June 2011 by and among the signatories listed on Exhibit A hereto, each residing or located at the address set forth opposite their name on Exhibit A (collectively, the "Members").

### EXPLANATORY STATEMENT

The parties have agreed to organize and operate a limited liability company in accordance with the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, for good and valuable consideration, the parties, intending legally to be bound, agree as follows:

### Article I.   Defined Terms

The following capitalized terms shall have the meaning specified in this Article I. Other terms are defined in the text of this Agreement; and, throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

"Adjusted Capital Account Deficit," means, with respect to any Interest Holder, the deficit balance, if any, in the Interest Holder's Capital Account as of the end of the relevant taxable year, after giving to the following adjustments:

(i) The deficit shall be decreased by the amounts which the Interest Holder is obligated to restore pursuant to Section 4.4.2 or is deemed obligated to restore pursuant to Regulation Section 1.704-1(b)(2)(ii)(c); and

(ii) The deficit shall be increased by the items described in Regulation Sections 1.704-1(b)(2)(ii)-(d)(4), (5), and (6).

"Adjusted Capital Balance," means, as of any day, an Interest Holder's total Capital Contributions less all amounts actually distributed to the Interest Holder pursuant to Sections 4.2.3.5.1 and 4.4 hereof. If any Interest is transferred in accordance with the terms of this Agreement; the transferee shall succeed to the Adjusted Capital Balance of the transferor to the extent the Adjusted Capital Balance relates to the Interest transferred.

"Affiliate" means, with respect to any Member, any Person: (i) which owns more than 50% of the voting interests in the Member; or (ii) in which the Member owns more than 50% of the voting interests; or (iii) in which more than 50% of the voting interest are owned by a Person who has a relationship with the Member described in clause (i) or (ii) above, or (iv) who otherwise controls, is controlled by or under common control with, another Person.

"Agreement" means this Operating Agreement, as amended from time to time.

"Capital Account" means the account to be maintained by the Company for each Interest Holder in accordance with the following provisions:

(i) An Interest Holder's Capital Account shall be credited with the Interest Holder's Capital Contributions, the amount of any Company liabilities assumed by the Interest Holder (or which are secured by Company property distributed to the Interest Holder), the Interest Holder's distributive share of Profit and any item in the nature of income or gain specially allocated to the Interest Holder pursuant to the provisions of Article IV (other than Section 4.3.3); and

(ii) An Interest Holder's Capital Account shall be debited with the amount of money and the fair market value of any Company property distributed to the Interest Holder, the amount of any liabilities of the Interest Holder assumed by the Company (or which are secured by property contributed by the Interest Holder to the Company), the Interest Holder's distributive share of Loss and any item in the nature of expenses or losses specially allocated to the Interest Holder pursuant to the provisions of Article IV (other than Section 4.3.3).

If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Interest. If the book value of Company property is adjusted pursuant to Section 4.3.3, the Capital Account of each Interest Holder shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment. It is intended that the Capital Accounts of all Interest Holders shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

"Capital Contribution" means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject.

"Capital Proceeds" means the gross receipts received by the Company from a Capital Transaction.

"Capital Transaction" means any transaction not in the ordinary course of business which results in the Company's receipt of cash or other consideration other than Capital Contributions, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards, and insurance proceeds.

"Cash Flow" means all cash funds derived from operations of the Company (including interest received on reserves), without reduction for any non-cash charges, but less cash funds used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements, and replacements as determined by the Managing Member. Cash Flow shall not include Capital Proceeds but shall be increased by the reduction of any reserve previously established.

"Code" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law or any corresponding provision.

"Company" means the limited liability company formed in accordance with this Agreement.

"Interest" means a Person's share of the Profits and Losses of, and the right to receive distributions from, the Company.

"Interest Holder" means any Person who holds an Interest, whether as a Member or an unadmitted assignee of a Member.

"Involuntary Withdrawal" means, with respect to any Member, the occurrence of any of the following events:

(i) The Member makes an assignment for the benefit of creditors;

(ii) The Member files a voluntary petition of bankruptcy;

(iii) The Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

(iv) The Member files a petition seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

(v) The Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

(vi) The Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (i) through (v);

(vii) Any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

(viii) If the Member is an individual, the Member's death, incapacity, or adjudication by a court of competent jurisdiction as incompetent to manage the Member's person or property;

3

(ix) If the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust;

(x) If the Member is a partnership or limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

(xi) If the Member is a corporation, the dissolution of the corporation or the revocation of its charter;

(xii) If the Member is an estate, the distribution by the fiduciary of the estate's entire interest in the Company; or

(xiii) The Member is expelled (if permitted in the operating agreement).

"Law" means the New York Limited Liability Company Act, codified in New York Code Annotated, Title 6, Chapter 18, Sections 18 through 101, *et seq.*, as the same may be amended from time to time.

"Majority of Members" means not less than Seventy Percent (70%) of the Membership Interests.

"Managing Member" means the Person designated as such in Article V.

"Member" means each initial member as set forth on Exhibit A and each person who has been admitted as a Member or a Substitute Member of the Company in accordance with the terms of the terms and provisions of the Law and this Agreement, with the rights, obligations and limitations specified under the Law and this Agreement.

"Membership Interest" means all of the rights of a Member in the Company, including a Member's: (i) Interest; (ii) right to inspect the Company's books and records; (iii) right to participate in the management of and vote on matters coming before the Company; and (iv) unless this Agreement or the Articles of Organization provide to the contrary, right to act as an agent of the Company.

"Member Loan Nonrecourse Deductions" means any Company deductions that would be Nonrecourse Deductions if they were not attributable to a loan made or guaranteed by a Member within the meaning of Regulation Section 1.704-2(i).

"Minimum Gain" has the meaning set forth in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Interest Holder in a manner consistent with the Regulations under Code Section 704(b).

"Negative Capital Account" means a Capital Account with a balance of less than zero.

4

"Nonrecourse Deductions" has the meaning set forth in Regulation Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Regulation Section 1.704-2(c).

"Nonrecourse Liability" means any liability of the Company with respect to which no Member has personal liability, as determined in accordance with Code Section 752 and the Regulations promulgated thereunder.

"Percentage" means, as to a Member, the percentage set forth after the Member's name on Exhibit A, as amended and/or deemed amended from time to time, and as to an Interest Holder who is not a Member, the Percentage of the Member whose Interest has been acquired by such Interest Holder, to the extent the Interest Holder has succeeded to that Member's Interest.

"Person" means and includes an individual, corporation, partnership, association, limited liability company, trust, estate or other entity.

"Positive Capital Account" means a Capital Account with a balance greater than zero.

"Profit" and "Loss" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

(i) all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss; and

(ii) any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss; and

(iii) any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss; and

(iv) gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes; and

(v) in lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(vi) Notwithstanding any other provision of this definition, any items, which are specially allocated pursuant to Section 4.3 hereof, shall not be taken into account in computing Profit or Loss.

"Regulation" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

"Transfer" means - when used as a noun - any sale, hypothecation, pledge, assignment, gift, bequest, attachment, or other transfer, including transfers by operation of Law, and - when used as a verb - means to sell, hypothecate, pledge, assign, give, bequeath, or otherwise transfer.

"Voluntary Withdrawal" means a Member's disassociation with the Company by means other than a Transfer or an Involuntary Withdrawal.

### Article II.   Formation and Formation and Name: Office; Purpose; Term

2.1. *Organization.* The parties have organized the Company as a New York limited liability company pursuant to the Law and the provisions of this Agreement and for that purpose, shall have caused a Certificate of Formation to be executed and filed with the New York Secretary of State.

2.2. *Name of the Company.* The name of the Company shall be <u>ASRR, LLC</u> . The Company may do business under that name and under any other name or names that the Managing Member selects.

2.3. *Purpose.* The Company is organized (a) to acquire, purchase, management, maintain, control, supervise, sell, and other wise transfer real and personal property and other assets in furtherance of the Company's directives, and (b) to pursue any other lawful business purpose or purposes.

2.4. *Term.* The term of the Company shall begin on June 7, 2011 and shall continue until the earlier of (a) its existence is sooner terminated pursuant to Article VII of this Agreement or (b) by operation of law.

2.5. *Members.* The name, present mailing address, taxpayer identification number, and Percentage of each Member are set forth on Exhibit A.

2.6. *Office and Agent.* The Company shall continuously maintain a registered agent in the State of New York as required by the laws of the State of New York. The principal office of the Company shall be as the Managing Member may determine. The Company also may have such offices anywhere within and without the State of New York, as the Managing Member from time to time may determine, or the business of the Company may require. The registered agent shall be as stated in the articles or as otherwise determined by the Managing Member.

## Article III.    Members; Capital; Capital Accounts

3.1. *Initial Capital Contributions.* The Capital Contributions of the Members shall be reflected and recorded in the books and records of the Company.  Other than the amount specified by

3.2. *Additional Capital Contributions.*  Except as provided otherwise herein, no Member shall be required to contribute any additional capital to the Company, and no Member shall have any personal liability for any debt, obligation, or liability of the Company.

3.3. *No Interest on Capital Contributions.* Interest Holders shall not be paid interest on their Capital Contributions.

3.4. *Return of Capital Contributions.* Except as otherwise provided in this Agreement, no Interest Holder shall have the right to receive any return of any Capital Contribution.

3.5. *Form of Return of Capital.* If an Interest Holder is entitled to receive a return of a Capital Contribution, the Interest Holder shall not have the right to receive anything but cash in return of the Interest Holder's Capital Contribution.

3.6. *Capital Accounts.*  A separate Capital Account shall be maintained for each Interest Holder.

3.7. *Loans.* Only Managing Member may, at any time, make or cause a loan to be made to the Company in any amount and on such terms as shall be approved by the Managing Member. The Managing Member may, at any time, make or cause a loan to be made to the Company in any amount and on such terms as approved the Managing Member.

3.8. *Uniform Commercial Code.*  The Membership Interests shall be deemed "securities" under Article 8 of the Uniform Commercial Code as in effect in the State of New York and shall be governed by Article 8 of the Uniform Commercial Code as in effect in the State of New York.

## Article IV.  Profit, Loss, and Distributions

4.1. *Distributions of Cash Flow and Allocations of Profit or Loss Other than Capital Transactions.*

4.1.1. *Profit or Loss Other Than from a Capital Transaction.* After giving effect to the allocations set forth in Section 4.3, for any taxable year of the Company, Profit or Loss (other than Profit or Loss resulting from a Capital Transaction, which Profit or Loss shall be allocated in accordance with the provisions of Sections 4.2.1 and 4.2.2) shall be allocated to the Interest Holders in accordance with their Percentages.

7

4.1.2. *Mandatory Cash Flow*. Cash Flow for each taxable year of the Company shall be distributed to the Interest Holders in proportion to their Percentages no later than ninety (90) days after the end of the taxable year.

4.2. *Distributions of Capital Proceeds and Allocation of Profit or Loss from Capital Transactions.*

4.2.1. *Profit*. After giving effect to the special allocations set forth in Section 4.3, Profit from a Capital Transaction shall be allocated as follows:

4.2.1.1. If the Sapir Organization or any related Sapir entity has made any capital contribution to the Company, then to repayment of said capital contribution first until such time that the capital contribution is repaid in full.

4.2.1.2. If one or more Interest Holders has a Negative Capital Account, to those Interest Holders, in proportion to their Negative Capital Accounts, until all of those Negative Capital Accounts have been increased to zero.

4.2.1.3. Any Profit not allocated pursuant to Section 4.2.1.1 shall be allocated to the Interest Holders in proportion to, and to the extent of, the amounts distributable to them pursuant to Section 4.2.3.

4.2.1.4. Any Profit in excess of the foregoing allocations shall be allocated to the Interest Holders in proportion to their Percentages.

4.2.2. *Loss*. After giving effect to the special allocations set forth in Section 4.3, Loss from a Capital Transaction shall be allocated as follows:

4.2.2.1. If one or more Interest Holders has a Positive Capital Account, to those Interest Holders, in proportion to their Positive Capital Accounts, until all Positive Capital Accounts have been reduced to zero.

4.2.2.2. Any Loss not allocated to reduce Positive Capital Accounts to zero pursuant to Section 4.2.2.1 shall be allocated to the Interest Holders in proportion to their Percentages.

4.2.3. *Capital Proceeds*. Capital Proceeds shall be distributed and applied by the Company in the following order and priority:

4.2.3.1. To the payment of all expenses of the Company incident to the Capital Transaction; then

4.2.3.2. To the payment of debts and liabilities of the Company then due and outstanding (including all debts due to any Interest Holder); then

8

4.2.3.3. To the establishment of any reserves that the Managing Member deems necessary for liabilities or obligations of the Company (unless a Majority of Members vote to establish a different level of reserves); then

4.2.3.4. Intentionally Left Blank; then

4.2.3.5. The balance shall be distributed as follows:

4.2.3.5.1. To the Sapir Organization or any related entity that has made a capital contribution to the Company until such capital contribution has been repaid in full;

4.2.3.5.2. To the Interest Holders in proportion to their Adjusted Capital Balances, until their remaining Adjusted Capital Balances have been paid in full;

4.2.3.5.3. The balance, to the Interest Holders in accordance with their Percentage.

4.3. *Regulatory Allocations.*

4.3.1. *Qualified Income Offset.* No Interest Holder shall be allocated Losses or deductions if the allocation causes the Interest Holder to have an Adjusted Capital Account Deficit. If an Interest Holder receives (1) an allocation of Loss or deduction (or item thereof) or (2) any distribution, which causes the Interest Holder to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Interest Holder, before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the excess as quickly as possible. This Section 4.3.1 is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under Code Section 704(b).

4.3.2. *Minimum Gain Chargeback.* Except as set forth in Regulation Section 1.704-2(f)(2), (3), and (4), if, during any taxable year, there is a net decrease in Minimum Gain, each Interest Holder, prior to any other allocation pursuant to this Article IV, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Interest Holder's share of the net decrease of Minimum Gain, computed in accordance with Regulation Section 1.704-2(g). Allocations of gross income and gain pursuant to this Section 4.3.2 shall be made first from gain recognized from the disposition of Company assets subject to non-recourse liabilities (within the meaning of the Regulations promulgated under Code Section 752), to the extent of the Minimum Gain attributable to those assets, and thereafter, from a pro rata portion of the Company's other items of income and gain for the taxable year. It is the intent of the parties hereto that any allocation pursuant to this Section 4.3.2 shall constitute a "minimum gain chargeback" under Regulation Section 1.704-2(f).

4.3.3. *Contributed Property and Book-Ups.* In accordance with Code Section 704(c) and the Regulations thereunder, as well as Regulation Section 1.704-l(b)(2)(iv)(d)(3), income, gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Interest Holders so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution). If the adjusted book value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, loss, and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under Code Section 704(c) and the Regulations thereunder.

4.3.4. *Code Section 754 Adjustment.* To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the Interest Holders in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

4.3.5. *Non-Recourse Deductions.* Non-Recourse Deductions for a taxable year or other period shall be specially allocated among the Interest Holders in proportion to their Percentages.

4.3.6. *Member Loan Non-Recourse Deductions.* Any Member Loan Non-Recourse Deduction for any taxable year or other period shall be specially allocated to the Interest Holder who bears the risk of loss with respect to the loan to which the Member Loan Non-Recourse Deduction is attributable in accordance with Regulation Section 1.704-2(b).

4.3.7. *Guaranteed Payments.* To the extent any compensation paid to any Member by the Company, including any fees payable to any Member pursuant to Section 5.3 hereof, is determined by the Internal Revenue Service not to be a guaranteed payment under Code Section 707(c) or is not paid to the Member other than in the Person's capacity as a Member within the meaning of Code Section 707(a), the Member shall be specially allocated gross income of the Company in an amount equal to the amount of that compensation, and the Member's Capital Account shall be adjusted to reflect the payment of that compensation.

4.3.8. *Unrealized Receivables.* If an Interest Holder's Interest is reduced (provided the reduction does not result in a complete termination of the Interest Holder's Interest), the Interest Holder's share of the Company's "unrealized receivables" and "substantially appreciated inventory" (within the meaning of Code Section 751) shall not be reduced, so that, notwithstanding any other provision of this Agreement to the contrary, that portion of the Profit otherwise allocable upon a liquidation or dissolution of the Company pursuant to Section 4.4 hereof which is taxable as ordinary income (recaptured) for federal income tax purposes shall, to the extent possible without increasing the total gain to the Company or to any Interest Holder, be

specially allocated among the Interest Holders in proportion to the deductions (or basis reductions treated as deductions) giving rise to such recapture. Any questions as to the aforesaid allocation of ordinary income (recapture), to the extent such questions cannot be resolved in the manner specified above, shall be resolved by the Managing Member.

4.3.9. *Withholding*. All amounts required to be withheld pursuant to Code Section 1446 or any other provision of federal, state, or local tax law shall be treated as amounts actually distributed to the affected Interest Holders for all purposes under this Agreement.

4.4. *Liquidation and Dissolution.*

4.4.1. If the Company is liquidated, the assets of the Company shall be distributed to the Interest Holders in accordance with the provisions of Section 4.2.3.

4.4.2. No Interest Holder shall be obligated to restore a Negative Capital Account.

4.5. *General.*

4.5.1. Except as otherwise provided in this Agreement, the Managing Member shall determine the timing and amount of all distributions.

4.5.2. If any assets of the Company are distributed in kind to the Interest Holders, those assets shall be valued on the basis of their fair market value, and any Interest Holder entitled to any interest in those assets shall receive that interest as a tenant-in-common with all other Interest Holders so entitled. Unless the Members otherwise agree, the fair market value of the assets shall be determined by an independent appraiser who shall be selected by the Managing Member. The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in Section 4.2 and shall be properly credited or charged to the Capital Accounts of the Interest Holders prior to the distribution of the assets in liquidation pursuant to Section 4.4.

4.5.3. All Profit and Loss shall be allocated, and all distributions shall be made to the Persons shown on the records of the Company to have been Interest Holders as of the last day of the taxable year for which the allocation or distribution is to be made. Notwithstanding the foregoing, unless the Company's taxable year is separated into segments, if there is a Transfer or an Involuntary Withdrawal during the taxable year, the Profit and Loss shall be allocated between the original Interest Holder and the successor on the basis of the number of days each was an Interest Holder during the taxable year; provided, however, the Company's taxable year shall be segregated into two or more segments in order to account for Profit, Loss, or proceeds attributable to a Capital Transaction or to any other extraordinary non-recurring items of the Company.

4.5.4. The Managing Member is hereby authorized, upon the advice of the Company's tax counsel, to amend this Article IV to comply with the Code and the Regulations promulgated

11

under Code Section 704(b); provided, however, that no amendment shall materially affect distributions to an Interest Holder without the Interest Holder's prior written consent.

## Article V.   Management: Rights, Powers, and Duties

5.1. *Management.*

5.1.1. *Managing Member.*  The Company shall be managed by a Managing Member, who may, but need not, be a Member.  The Managing Member shall be <u>Alex Sapir and Rotem Rosen</u>. The Managing Member shall not be removed except as may otherwise be set forth in this Agreement.  Except as provided in Section 5.1.3, each Managing Member shall have the right to manage the day-to-day business of the Company.

5.1.2. *General Powers.*  Except as otherwise set forth herein, each Managing Member shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the requirement that no single Managing Member make any decision or take any action that has the monetary effect of greater than $50,000.00 to the Company, and further pursuant to the other provisions of this Agreement and the requirements of applicable law, to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs, including, without limitation, for Company purposes, the power to:

5.1.1.1.  Acquire by purchase, lease, or otherwise, any real or personal property, tangible or intangible;

5.1.2.2. Construct, operate, maintain, finance, and improve, and to own, sell, convey, assign, mortgage, or lease any real estate and any personal property;

5.1.2.3. Sell, dispose, trade, or exchange Company assets in the ordinary course of the Company's business;

5.1.2.4. Enter into agreements and contracts, including, but not limited to, contracts of guaranty and suretyship, and to give receipts, releases, and discharges;

5.1.2.5. Purchase liability and other insurance to protect the Company's properties and business;

5.1.2.6. Borrow money, invest, open bank or money management accounts for and on behalf of the Company in accordance with Section 5.1.3.2;

5.1.2.7. Execute or modify leases with respect to any part or all of the assets of the Company;

5.1.2.8. Prepay, in whole or in part, refinance, amend, modify, or extend any mortgages or deeds of trust which may affect any asset of the Company and in connection

therewith to execute for and on behalf of the Company any extensions, renewals, or modifications of such mortgages or deeds of trust;

      5.1.2.9. Execute any and all other instruments and documents which may be necessary or in the opinion of the Managing Member desirable to carry out the intent and purpose of this Agreement, including, but not limited to, deeds, contracts, leases, mortgages, deeds of trust, promissory notes, security agreements, financing statements pertaining to the Company's assets or obligations, and documents whose operation and effect extend beyond the term of the Company;

      5.1.2.10. Make any and all expenditures which the Managing Member, in his or her sole discretion, deems necessary or appropriate in connection with the management of the affairs of the Company and the carrying out of its obligations and responsibilities under this Agreement, including, without limitation, all legal, accounting and other related expenses incurred in connection with the organization and financing and operation of the Company;

      5.1.2.11. Enter into any kind of activity necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Company; and

      5.1.2.12. Invest and reinvest Company reserves in short-term instruments or money market funds.

    5.1.3. Any decision or action that must be taken on behalf of the Company that has an effect in excess of $50,000.00 shall be made jointly by both Managing Members.

    5.1.4. *Limitation on Authority of Members.*

      5.1.4.1. No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member.

      5.1.4.2. This Section 5.1 supersedes any authority granted to the Members pursuant to the Law. Any Member who takes any action or binds the Company in violation of this Section 5.1 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

    5.1.5. *Removal of Managing Member.* The Managing Member may not be removed unless he/she voluntarily resigns or unless a Managing Member is removed for cause in accordance with subsection (b) of this Section 7.03. For the purposes of this Agreement, "for cause" shall mean (A) a default by a Managing Member in performing or observing any of his duties or obligations under this Agreement if arising out of (i) the Managing Member's gross negligence, fraud or intentional misrepresentation of a matter expressly represented in this Agreement or in any other material document or instrument provided to the Company as contemplated in this Agreement or (ii) the willful misconduct of the Managing Member and, in

the event of any such matter in (i) or (ii) above, the same is not cured within thirty (30) days after written notice from the Company to the Managing Member, (A) a resignation or withdrawal by the Managing Member, or (B) the taking of any Bankruptcy Action by the Managing Member individually. If the Company terminates the Managing Member "for cause" in accordance with the terms of this Section , then the remaining managing member shall be determined to be the sole "Managing Member" for all purposes of this Agreement.

5.2. *Meetings of and Voting by Members.*

5.2.1. No annual or regular meetings of the Members as such shall be required.

5.2.2. A meeting of the Members may be called at any time by the Managing Member. The notice shall state the place, date, hour, and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy without objecting to the lack of notice.

5.2.3. Except as otherwise provided in this Agreement, only the affirmative vote of the Managing Member shall be required to approve any matter coming before the Members.

5.3. *Personal Service.*

5.3.1. No Member shall be required to perform services for the Company solely by virtue of being a Member. Unless approved by the Managing Member, no Member shall perform services for the Company or be entitled to compensation for services performed for the Company.

5.3.2. Upon approval the Managing Member, the Managing Member shall be entitled to compensation for services performed for the Company in such amounts as determined by such members. Further, upon substantiation of the amount and purpose thereof, the Managing Member shall be entitled to reimbursement for expenses reasonably incurred in connection with the activities of the Company.

5.4. *Duties of Parties.*

5.4.1. The Managing Member shall devote such time to the business and affairs of the Company as is necessary to carry out the Managing Member's duties set forth in this Agreement.

5.4.2. Except as otherwise expressly provided in Section 5.4.3, nothing in this Agreement shall be deemed to restrict in any way the rights of any Member, or of any Affiliate of any Member, to conduct another business or activity  even if the business or activity compete with the Company's business.  The organization of the Company shall be without prejudice to the Members' respective rights (or the rights of their respective Affiliates) to maintain, expand or diversify such other interests and activities and to receive and enjoy profits or compensation

14

therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or the Member's Affiliates.

5.4.3. Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Members and their Affiliates. In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms.

5.5. *Liability and Indemnification.*

5.5.1. Except as otherwise provided by law, neither the Managing Member nor any Member shall be liable, responsible, or accountable in any way for damages or otherwise to the Company or to any of the Members for any act or failure to act pursuant to this Agreement or otherwise unless there is a judicial determination that (i) such person acted in bad faith, (ii) the conduct of such person constituted intentional misconduct or a knowing violation of law, (iii) such person gained a financial benefit to which he or she was not legally entitled, or (iv) such person failed to perform his or her duties, specifically with respect to distributions under section 508(a) of the Law, in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.

5.5.2. The Company shall indemnify, defend, and hold harmless the Managing Member and each of the Members (severally, the "Indemnitee" and collectively, the "Indemnitees"), from and against any claims, losses, liabilities, damages, fines, penalties, costs, and expenses (including, without limitation, reasonable fees and disbursements of counsel and other professionals) arising out of or in connection with any act or failure to act by an Indemnitee pursuant to this Agreement, or the business and affairs of the Company to the fullest extent permitted by law; provided, however, that an Indemnitee shall not be entitled to indemnification hereunder if there is a judicial determination that (a) such Indemnitee's actions or omissions to act were made in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or (b) such Indemnitee personally gained a financial benefit to which the Indemnitee was not legally entitled.

5.6. *Power of Attorney.*

5.6.1. *Grant of Power.* Each Member constitutes and appoints the Managing Member as the Member's true and lawful attorneys-in-fact ("Attorneys-in-Fact"), and in the Member's name, place, and stead, to make, execute, sign, acknowledge, and file:

5.6.1.1. One or more Articles of Organization;

5.6.1.2. All documents (including amendments to Articles of Organization) which the Attorney-in-Fact deems appropriate to reflect any amendment, change, or modification of this Agreement;

15.

5.6.1.3. Any and all other certificates or other instruments required to be filed by the Company under the laws of the State of New York or of any other state or jurisdiction, including, without limitation, any certificate or other instruments necessary in order for the Company to continue to qualify as a limited liability company under the laws of the State of New York and ;

5.6.1.4. One or more fictitious or trade name certificates; and

5.6.1.5. All documents which may be required to dissolve and terminate the Company and to cancel its Articles of Organization.

5.6.2. *Irrevocability.* The foregoing power of attorney is irrevocable and is coupled with an interest, and, to the extent permitted by applicable law, shall survive the death or disability of a Member. It also shall survive the Transfer of an Interest, except that if the transferee is admitted as a Member, this power of attorney shall survive the delivery of the assignment for the sole purpose of enabling the Attorney-in-Fact to execute, acknowledge, and file any documents needed to effectuate the substitution. Each Member shall be bound by any representations made by the Attorney-in-Fact acting in good faith pursuant to this power of attorney, and each Member hereby waives any and all defenses that may be available to contest, negate, or disaffirm the action of the Attorney-in-Fact taken in good faith under this power of attorney.

### Article VI.   Transfer of Interests and Withdrawal of Members

6.1. *Transfers.* Any Member may (subject to the terms of any binding agreements in place) voluntarily, without the written consent of the other Members, transfer all or any portion of, or any interest or rights in, the Membership Interest owned by the Member.

6.2. *Voluntary Withdrawal.* Any Member shall have the right and power to Voluntarily Withdraw from the Company, except as otherwise provided by this Agreement or by law.

6.3. *Involuntary Withdrawal.* Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the Withdrawn Member shall thereupon become an Interest Holder but shall not become a Member. If the Company is continued as provided in Section 7.1.3, the successor Interest Holder shall have all the rights of an Interest Holder, but shall not be entitled by reason of the withdrawal to receive in liquidation of the Interest, the fair market value of the Member's Interest as of the date the Member Involuntarily withdrew from the Company.

### Article VII.   Dissolution, Liquidation, and Termination of the Company

7.1. *Events of Dissolution.* The Company shall be dissolved upon the happening of any of the following event:

7.1.1. The occurrence of an Involuntary Withdrawal, unless all of the remaining Members, within ninety (90) days after the occurrence of the Involuntary Withdrawal,

unanimously elect to continue the business of the Company pursuant to the terms of this Agreement.

7.2. *Procedure for Winding Up and Dissolution*. If the Company is dissolved, the Managing Member shall wind up its affairs. On winding up of the Company, the assets of the Company shall be distributed, first, to creditors of the Company, including Interest Holders who are creditors, in satisfaction of the liabilities of the Company, and then to the Interest Holders in accordance with Section 4.4.

7.3. *Filing of Articles of Dissolution*. If the Company is dissolved, the Managing Member shall promptly file Articles of Dissolution with the New York Secretary of State. If there are no Managing Member, then the Articles of Dissolution shall be filed by the remaining Members; if there are no remaining Members, the Articles shall be filed by the last Person to be a Member; if there are neither Managing Member, remaining Members, nor a Person who last was a Member, the Articles shall be filed by the legal or personal representatives of the Person who last was a Member.

### Article VIII. Books, Records, Accounting, and Tax Elections

8.1. *Bank Accounts*. All funds of the Company shall be deposited in a bank account or accounts opened in the Company's name. The Managing Member shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

8.2. *Books and Records*.

8.2.1. The Managing Member shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the Company's business. The records shall include, but not be limited to:

(1) a current alphabetized list of the names and addresses of all of the Members, as well as the contribution and the share of profits and losses of each Member or information from which such share can be readily derived;

(2) a current alphabetized list of the names and addresses of all of the Managing Member;

(3) a copy of the Articles of Organization and all amendments thereto or restatements thereof, together with executed copies of any powers of attorney pursuant to which any certificate or amendment has been executed;

(4) a copy of the operating agreement and any amendments thereto and any amended and restated operating agreement; and

(5) a copy of the Company's federal, state, and local income tax or information returns and reports, if any, for the three most recent fiscal years.

17

8.3. *Annual Accounting Period.* The annual accounting period of the Company shall be its taxable year. The Managing Member, subject to the requirements and limitations of the Code, shall select the Company's taxable year.

8.4. *Reports.* Within seventy-five (75) days after the end of each taxable year of the Company, the Managing Member shall cause to be sent to each Person who was a Member at any time during the taxable year then ended a copy of an annual compilation report, prepared by the Company's independent accountants in accordance with standards issued by the American Institute of Certified Public Accountants together with a report on the affairs of the Company. In addition, within seventy-five (75) days after the end of each taxable year of the Company, the Managing Member shall cause to be sent to each Person who was an Interest Holder at any time during the taxable year then ended, that tax information concerning the Company which is necessary for preparing the Interest Holder's income tax returns for that year. At the request of any Member holding not less than sixty-seven percent (67%) or more of the Membership Interest, and at the Member's expense, the Managing Member shall cause an audit of the Company's books and records to be prepared by independent accountants for the period requested by the Member.

8.5. *Tax Matters Member.* The Managing Member shall appoint the Company's tax matters member pursuant to Code Section 6231(a)(7) ("Tax Matters Member"). The Tax Matters Member shall have all powers and responsibilities provided in Code Section 6221, et seq. The Tax Matters Member shall keep all Members informed of all notices from government taxing authorities that may come to the attention of the Tax Matters Member. The Company shall pay and be responsible for all reasonable third party costs and expenses incurred by the Tax Matters Member in performing those duties. A Member shall be responsible for any costs incurred by the Member with respect to any tax audit or tax-related administrative or judicial proceeding against any Member, even though it relates to the Company. The Tax Matters Member shall not compromise any dispute with the Internal Revenue Service without the approval of the Members. The Managing Member may appoint himself or herself as the Tax Matters Member.

8.6. *Tax Elections.* The Managing Member shall have the authority to make all Company elections permitted under the Code, including, without limitation, elections of methods of depreciation and elections under Code Section 754. The decision to make or not make an election shall be at the Managing Member' sole and absolute discretion.

8.7. *Title to Company Property.*

8.7.1. Except as provided in Section 8.7.2, all real and personal property acquired by the Company shall be acquired and held by the Company in its name.

8.7.2. The Managing Member may direct that legal title to all or any portion of the Company's property be acquired or held in a name other than the Company's name. Without limiting the foregoing, the Managing Member may cause title to be acquired and held in its name or in the names of trustees, nominees, or straw parties for the Company. It is expressly

understood and agreed that the manner of holding title to the Company's property (or any part thereof) is solely for the convenience of the Company and all of that property shall be treated as Company property.

## Article IX.  General Provisions

9.1. *Assurances*. Each Member shall execute all certificates and other documents and shall do all such filing, recording, publishing and other acts as the Managing Member deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

9.2 *Notifications*. Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and either delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested or by facsimile transmission, provided receipt of facsimile transmission is actually acknowledged by the member or member's agent. Any notice to be given hereunder by the Company shall be given by the Managing Member. A notice must be addressed to a Member at the Member's last known address on the records of the Company. A notice to the Company must be addressed to the Company's principal office. A notice that is sent by mail will be deemed given three (3) business days after it is mailed. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees. A notice sent by facsimile is deemed given when receipt is acknowledged.

9.3. *Specific Performance*. The parties recognize that irreparable injury may result from a breach of any provision of this Agreement and that money damages may be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, the Company as well as any party who may be injured (in addition to any other remedies which may be available to the Company or that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

9.4. *Complete Agreement*. This Agreement constitutes the complete and exclusive statement of the agreement among the Members with respect to the subject matter thereof. It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of the Members holding two-thirds (2/3) or more of the Percentages then held by Members.

9.5. *Applicable Law*. All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of New York.

19

9.6. *Article and Section Titles*. The headings herein are inserted as a matter of convenience only and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

9.7. *Binding Provisions*. This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

9.8. *Exclusive Jurisdiction and Venue*. Any suit involving any dispute or matter arising under this Agreement or relating to the organization or operation of the Company may only be brought in a United States District Court for the Southern or Eastern Districts of the State of New York or any New York State Court in the City of New York having jurisdiction over the subject matter of the dispute or matter. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding and waive any objection to venue or inconvenient forum.

9.9. *Terms*. Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the identity of the Person may in the context require.

9.10. *Separability of Provisions*. Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement that are valid.

9.11. *Counterparts*. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

[Signature Page to Follow]

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, as of the date set forth hereinabove.

MEMBERS:

_____
Alex Sapir

_____
Rotem Rosen

**Limited Linbility Company**
**Operating Agreement**
**Exhibit A**
**List of Members, Capital, and Percentages**

| Member(s) | Cap Contr. | Percentages |
|---|---|---|
| Alex Sapir | $10.00 | 50% |
| Rotem Rosen | $10.00 | 50% |

22