# EXHIBIT A

```
STATE OF NEW YORK
COUNTY OF NEW YORK: SURROGATE'S COURT
------------------------------------------x
IN THE MATTER(S) OF:
                                        FILE NO.:
ESTATE OF TAMIR SAPIR,                  2014-4683/A


                Decedent.
------------------------------------------x


                Virtual Proceedings
                31 Chambers Street
                New York, New York 10007
                June 07,2022


BEFORE:         HONORABLE RITA MELLA


APPEARANCES:    ANDREW J. URGENSON, ESQ.
                Appearing for Alex Sapir,
                Preliminary Executor of the Estate
                Of Tamir Sapir


                SHERON KORPUS, ESQ.,
                DONALD KNOVICK, ESQ.,
                APPEARING for Rotem Rosen,
                Claimant.


                CHARLES SCOTT, ESQ.
                Appearing for Elena Sapir.


                BRIAN CORRIGAN, ESQ.
                Appearing for Alex Sapir, Ruth Sapir
                Berenstien, (ph.) and Zena Sapir.


                WILLIAM TURKISH, ESQ.
                Appearing for Rosita Sophia and Alan Cohen


                BONNIE CHMIL, ESQ.
                Appearing for Elena Saphir
```

                                "OFFICIAL TRANSCRIPT"

Digital Recorded Proceeding, Rosie M. Zayas, Transcriber

1  (3:04:31)

2              COURT OFFICER:  Good afternoon.

3              MR. URGENSON:  Good afternoon.

4              MR. KORPUS:  Good afternoon.

5              COURT OFFICER:  This is Surrogate Rita Mella,

6     miscellaneous calendar for Tuesday, June 7 of 2022.  At

7     this time, we're calling application twelve in the Estate

8     of Tamir Sapir, last name S-A-P-I-R, and the file number is

9     2014-4683 sub record A as an apple.

10             THE COURT:  Good afternoon, everyone.

11             MR. KORPUS:  Good afternoon Judge.

12             MR. URGENSON:  Good afternoon Your Honor.

13             THE COURT:  And yes, we are conducting these

14    proceedings through virtual means.  This is our new

15    reality, post pandemic.  I am in the courthouse as you can

16    see but you are all appearing virtually and thank you for

17    doing that, for being willing to appear virtually.

18             So, may I have your appearances please.

19             MR. URGENSON:  Thank you Your Honor.  Good

20    afternoon, this is Andrew Urgenson, from Oved & Oved LLP,

21    counsel for the estate.

22             MR. OVED:  Good afternoon Your Honor, this is

23    Terence Ovid, representing the estate as well.

24             MR. KORPUS:  Good afternoon Your Honor, Sheron

25    Korpus, representing the claimant.

1          MR. NOVICK:  Good morning – good afternoon Your

2     Honor, Donald Novick, also representing Rotem Rosen, the

3     claimant.

4          MR. SCOTT:  Good afternoon Your Honor, Charles

5     Scott representing Elena Saphir as guardian of the property

6     of the descendants, infant son, Elie Sapir.

7          MR. CORRIGAN:  Good afternoon Your Honor, Brian

8     Corrigan, Farrell Fritz, representing Alex Sapir, Ruth

9     Sapir Berenstien (ph.) and Zena Sapir, all in their

10     individual capacities.

11          THE COURT:  Mr. Corrigan, are you also

12     representing the former infant Zitta (ph.)?

13          MR. CORRIGAN:  I am not, Your Honor.

14          THE COURT:  No, okay.

15          MS. CHMIL:  (Inaudible)

16          THE COURT:  I'm sorry –(inaudible) we cannot hear

17     you.

18          MS. CHMIL:  Oh, one moment.

19          MR. URGENSON:  While we wait for Sheron Korpus to

20     get in I also have with me Gavin Schryver and (inaudible)

21     Braun (ph.).

22          MR. TURKISH:  Your Honor, William Turkish,

23     Braunstein Turkish for Rosita Sophia and Alan Cohen.

24          MALE SPEAKER:  Your Honor is this message for

25     him?

1                    THE COURT:  No.

2                    MS. CHMIL:  Can you hear me now?

3                    THE COURT:  Yes, we can hear you and we can see

4        you.

5                    MS. CHMIL:  Thank you.  They changed my

6        settings, I apologize.  Bonnie Chmil, for Catten, LLP on

7        behalf of Elena Saphir, individually.

8                    THE COURT:  So, it's Chmil?

9                    MS. CHMIL:  Ok okay I'm so glad that you told me

10       that.

11                   MS. CHMIL:  Thank you Your Honor.

12                   THE COURT:  Okay.  So, before the court is a

13       motion for summary judgment in the preliminary executors

14       proceeding to this (inaudible) claim.  I had granted a

15       continuance of this motion from the bench on December

16       eleventh, twenty twenty, then also by written decision

17       dated March nine, twenty twenty-one.  And the continuance

18       was granted pursuant to CPLR 3211 subdivision f, as in

19       Frank.

20           The parties then engaged in discovery as allowed by me

21       and have now filed supplemental papers in support of their

22       respective positions.  Of course, the last papers received

23       were reply papers by the (inaudible) the preliminary

24       executor.

25           So, I'm asking you Mr. Korpus, and I have of course

1    read your papers and I'm familiar with your argument.  I'm

2    asking if there is anything that you would like to address

3    on the record today concerning the arguments made by

4    (inaudible) in the reply papers.

5            MR. KORPUS:  Thank you Your Honor.  Your Honor in

6    brief the supplemental briefing on the exenterate the fact

7    heartly disputed here, and a summary judgement is improper.

8    And I think that it is particularly glaring in the papers

9    submitted by the estate where they put in declarations by

10    the estate's accountant Mr. Kahan and the estates attorney

11    Mr. Wechsler, trying to dispute emails on the record and

12    trying to dispute previous statements made clearly by Mr.

13    Kahan and Mr. Wechsler in emails.

14        I don't know how the court can resolve those kinds of

15    issues on the papers.  But more fundamentally, the estate

16    seems to have lost the focus of the supplemental briefing.

17    The court continued the motion to allow Mr. Rosen to

18    discover facts to justify his defenses on the statute of

19    frauds and on vagueness indefinites of the agreement.

20        And in a subsequent conference Mr. Wechsler after

21    checking with Your Honor confirmed that the purpose of the

22    statue of fraud discovery was so the court could see

23    whether the estate satisfied its burden, that there was no

24    disputed fact and that all the work done by ASRR was the

25    intermediary type work that's excluded as opposed to work

1    that's not excluded under the appellate division decision

2    in Dulfman.

3        And if you look at the papers that's exactly what we

4    did.  We showed you out for years day in, day out, ASRR

5    engaged in the of managing these assets and did much more

6    than just acting as (inaudible)  or broker.

7        Just like the (inaudible) in the pre Dolfmen (ph.)

8    cases, unlike the cases, the pre Dulfman cases, that they

9    rely on with just a short intermediary role.

10       In fact, with ASRR, it was carried out the duties of

11   the principle in managing these properties for years.

12   That's why we have numerous press releases and a

13   prospective specifically recognizing the role play by ASRR.

14       And the estate ignores all that and make arguments in

15   the reply that they made before when we appeared before you

16   eighteen months ago.

17       For example, they argued that if some of the work is

18   covered by the statute of fraud, the entire claim failed.

19   They presented at court to you the last hearing, and if the

20   court had accepted it, summary judgment would have been

21   ordered at that time.  But it wasn't because that's not the

22   law.  And Dulfman and the other cases on the brief make

23   that clear.  And only definiteness the record actually

24   became much more favorable for the claimant.

25       Because first, the estate now admitted in response to

1    request for admission number ten, that ASRR was paid for

2    the HSBC work through the Russian judgment proceeds.  So,

3    the estate has now admitted it on two prior occasions.  The

4    parties were able to calculate the amount owed to ASRR.

5    The twenty ten restricting and the HSBC restructuring.  And

6    from the document, we were able to calculate almost to the

7    exact amount to the seventy-five million dollars that was

8    paid to ASRR and the (inaudible).  And the estate only

9    response is to submit an affidavit from the accountant,

10   Alan Kahan, trying to recant his previous email and the

11   recital in the security agreement that recalculated that

12   amount.  I mean that is as far from summary judgment as you

13   can get.

14        And finally, I'm not going to get into it, into the

15   details here unless you want me to.  But in a belated

16   motion for reconsideration the estate rehashes the same

17   arguments on the release that the court rejected before.

18        Now, there was no discovery and the release you didn't

19   order discovery on the release, and if the court was

20   inclined to accept that a release to breach the estate to

21   Mr. Tamir (inaudible) parties, could release this claim the

22   court could have resolved it again eighteen months ago and

23   you didn't.  Because you send us to get discovery on the

24   two issues, statute of fraud and indefiniteness.

25        If anything, what we learned from all this discovery,

1    if the claimant has a strong case and what is the court

2    issue here.  And that issue is whether or not Alex on

3    behalf of Tamil on multiple occasions promised, that ASRR

4    would be compensated for the work in 2014 and 2015 in the

5    same manner that it had been compensated before and is

6    reflected in the 2011 letter.  That's what this case is

7    about.  Whether there was an agreement or whether ASRR had

8    a reasonable expectation of being so compensated.

9        And as I said, you raised a question at the last

10   hearing, that how you people make an oral agreement

11   involving such large sum of money.  We now know from this

12   request for admission, that they did it once before.  They

13   did it in connection with the HSBC loan restructuring.  The

14   estate admits that sixteen million dollars was paid to ASRR

15   as under an oral agreement that came after the date of the

16   letter agreement.  There were all family members at that

17   time.  That's the way they operated.  There is a cause of

18   conduct here.  And that way in the email from Mr. Wechsler,

19   which references quote 'the monies owed to ASRR by your

20   father".  Not the monies paid, the monies owed.

21       And Mr. Wechsler submitted an affidavit trying to

22   explain another way too.  Saying no, I was talking about

23   the money under the original agreement, but again, that's

24   something that needs to be explored in the depositions and

25   ultimately at trial.

1      Thank you Your Honor.  I have more arguments to make

2   on each one of these but I thought I just give you a recap

3   and I happy to answer any questions.

4           THE COURT:  Thank you.  I just want to say that

5   nothing should be referred from my decision to allow

6   discovery as only two of the grounds upon which (inaudible)

7   relied in the summary judgment motion.  I did not make a

8   decision as to any of the arguments made by (inaudible).  I

9   have not ruled on the motion, I have not made a partial

10  ruling on the motion.  There's no ruling at all.  So,

11  nothing should be inferred from that.  Just want to clarify

12  that.

13          MR. KORPUS:  Your Honor I appreciate the

14  clarification.  If you'd like me to address the arguments

15  in detail on the release I can.  They are the same

16  arguments that we argued last time but I'm happy to go

17  through them.

18          THE COURT:  Yeah, no, it's okay.  As I said, I'm

19  familiar with your papers.

20          MR. KORPUS:  Thank you Your Honor.

21          THE COURT:  So, Mr., I'm assuming I guess because

22  last time it was Mr. Urgenson who spoke.  I'm assuming he

23  would be addressing the questions of, my questions today,

24  is that true?

25          MR. URGENSON:  That is correct Your Honor, thank

1    you.  This is Mr. Urgenson.

2            THE COURT:  Okay.  So, Mr. Korpus mentioned that

3    you are submitting two affidavits, one by Mr. Wexler and

4    one by Mr. Kahan that seem to be making factual statements.

5    And so (inaudible) you know you cannot really resolve these

6    issues in summary judgement.  These are factual issues, he

7    said.  And could you please address that Mr. Urgenson?

8            MR. URGENSON:  Yes, sure Your Honor.  Just, the

9    first point and I have many on this topic is that Claimants

10   had the opportunity to take both of their depositions but

11   they specifically elected to waive depositions and I think

12   that was a telling decision.  Because they really didn't

13   want to know the answers.  They rather come into court and

14   say we need more discovery.

15        Because the bottom line is, these are undisputed

16   statements, that Mr., (inaudible) bring out summary

17   judgments to bring forth evidence in an admissible form.  I

18   did so by way of these affidavits.  And Mr. Korpus has no

19   way of disputing these affidavits.  He could have tried to

20   by taking a deposition but again he waived it.

21        So, the fact that he's saying that we need more

22   depositions, is not an acceptable argument because he's

23   bared from taking those depositions based on his own

24   client's decision.

25            But the more important issue Your Honor is neither of

1    those affidavits really matter for the purpose of this

2    motion.

3         First of all, if Mr. Wechsler, an attorney who is new

4    to the case simply referenced that there was a debt.

5    That's all he said.  Okay.  That's all he said, he didn't

6    say for what it was for, he didn't say anything like that.

7    And he clarified that at the time he wrote that.  He was

8    referring to the amount that already paid on the security

9    agreement he just didn't know what had been paid.

10        Mr. Korpus has no book, no recent to dispute that.  I

11   mean it's –- there's nothing in the record to dispute that.

12   But more importantly Your Honor, he not only explained

13   that,  he explained that he was (inaudible), he was, had

14   numerous discussions with Rotem and Alex and nobody ever

15   raised this additional claim and it never made it into any

16   of the tax filings.

17        So, he was preparing these documents for the purposes

18   of doing the state tax return.  He had nothing else besides

19   the security made it in.  So that indefinitely proves Mr.

20   Wechsler's affidavit.

21        But the point is, the main point is, it doesn't matter

22   for this motion at all.  Because based on the case law,

23   that we briefed, such a statement just vaguely referring to

24   a debt, is not enough to satisfy the statute of frauds.

25        A, because it wasn't written by Alex and he's the

1    person who allegedly charged with these oral statements.

2         And b, it doesn't mention any work and c, it doesn't

3    mention any terms of an alleged agreement.

4         So, even if Mr., even if the Court was somehow just

5    believed Mr. Wechsler's undisputed affidavit, it doesn't

6    matter because it's still not enough to satisfy the statute

7    of frauds.

8         By the same token, Mr., they had the opportunity to

9    take Mr. Kahan's deposition.  Unlike them, I had since

10   spoke to Mr. Kahan, he said that he did not calculate these

11   amounts and he has no idea how they were calculated.  And

12   frankly he was frankly surprised to see that email.

13        But the point here is that, we demonstrated separate

14   and apart from Kahan's affidavit, that there is no

15   mathematical possible way to take two percent of the asset

16   sold as a result of two thousand ten restructuring and get

17   to seven five million dollars.  It's not even close, not

18   even close.

19        So, regardless if whether or not the court believes

20   Mr. Kahn or doesn't believe Mr. Kahn, we've showed that

21   there is literally no possible way to use a fixed ten

22   percent formula to get to the seventy-five million dollars.

23   The same thing with the HSBC debt.

24        But I also want to raise one that was very misleading

25   about what Mr. Korpus just said.  Mr. Korpus said that in

1    the HSBC work, there was no writing about the estate

2    compensating ASRR for the work and the HSBC work.  And that

3    that was evidence that they didn't need to have a writing.

4    He's completely ignored, completely ignoring the third page

5    of the letter agreement.  The third page in the letter

6    agreement, after it talks about the restructuring work Your

7    Honor, it specifically says, on a personal level we have

8    managed to sell your plane, 384 Fifth Avenue and the Duke

9    Mansion on 82nd Street for the record price in the bottom of

10   the market to Mr. Pirellis Ling (ph.)

11        Even your lender HSBC was amazed by the magnitude of

12   the transactions for which we weren't paid the also and

13   expect (inaudible) commitment to have paid us in the near

14   future.

15        Those three transactions are what they admit.  In

16   their interrogatories were the three transactions they

17   engaged in in order to discharge the HSBC work.

18        And then he follows and says, unfortunately

19   investments in the Japanese and together with the existing

20   loan on the Russia house and the boat puts you today in a

21   balance due to HSBC of about sixty million dollars for

22   which you were in default and had to spend a lot of legal

23   fees.

24        So, Your Honor, there was a writing.  This was signed

25   by Tamir.  It says, we expect to be paid for the HSBC work

1    and he described what that work was.  Ultimately they were

2    paid for the HSBC work.

3         So, the notion that they didn't have to have a writing

4    is completely belied by the letter, by the way the that

5    Wilton Rosen drafted.

6         And Your Honor, every time ASRR received compensation,

7    it was done by a writing.  When they managed 260-261

8    Madison, there was a written management agreement.

9         So, Your Honor, I have many arguments here.  I'd like

10   to, in response to your question was there anything in

11   response to the reply, Mr. Korpus basically gave his entire

12   argument.  I don't want to do the same unless you want me

13   to.  But I'm happy to go into more detail.  But I think

14   I've answered your question.

15             THE COURT:  All right, as I said, I am familiar

16   with your arguments.  And I don't want you to repeat what

17   is already on the papers.

18             MR. URGENSON:  Okay.

19             MR. KORPUS:  Your Honor if I may respond to Mr.

20   Urgenson?

21             THE COURT:  Sure –

22             MR. KORPUS:  On the --

23             THE COURT:  -- but briefly Mr. Korpus please.

24             MR. KORPUS:  -- it will be very brief.  On the

25   question of depositions, these are the sequence.  We have

1       noticed the deposition of Mr. Sapir, they have notice of

2       the deposition of Mr. Rosen.  Mr. Urgenson approached us

3       and said, we have the burden of the motion, we don't think

4       we need depositions why don't we just agree there's no

5       depositions for the purpose of the motion.  I agreed with

6       him.  The burden is on him.

7            At that time, there were no affidavits, the motion had

8       not been briefed yet.  I had not seen the affidavits and I

9       agree, and I agree today that the burden is on him on

10      summary judgment and it cannot satisfy that burden by

11      submitting affidavits about heartly contested as to whether

12      or not what Mr. Wechsler refers to an existing debt or a

13      past debt.

14           And with regard to Mr. Kahan, Mr. Kahan, there is an

15      email on the record from Mr. Kahan, where he clearly said,

16      that he calculated the record.  He calculated the amount

17      of, the amount due.  It's on (inaudible) fourteen.  Alex

18      emailed Kahan a copy of the log agreement asking to

19      quantify the receivable.  Kahan writes back, and says, the

20      amount due as per the agreement is calculated based on the

21      sale of assets used to restructure the above.

22           And we calculated it ourselves.  It's in our papers.

23      He says its mathematically impossible, we came within point

24      one four percent based on public records, based on an email

25      from Alex to Jane (inaudible) the family's lawyer.  Based

1    on admissions made by the estate.  We got to that same

2    number.  So, it's not mathematically impossible, in fact it

3    was very easy for us to do.

4         And finally on the fact that HSBC was reference in the

5    letter agreement, that's not the point.  The point is that

6    there has been a moving target on that.  Last time when

7    they were before you, they argued that it was totally

8    fabricated that ASRR was paid through the -- it's in your

9    papers, I'll give you the cite Your Honor.

10        Your Honor if you look at the initial, the estate

11   memorandum at page twenty-nine, it describes oral

12   engagement through the claimant estate through the Russian

13   judgment for the HSBC work as quote, "totally false and

14   contrived" that's on page twenty-nine of the initial brief.

15        Now that we showed them that we did, they come in and

16   say no, no, no, no, no.  It was paid through the Russian

17   judgment.  But that only strengthen our case.

18        The fact that there was a cause of conduct here where

19   on two occasions ASRR was paid for the work.  And now we

20   have public documents that recognizes ASRR continued to do

21   the work, numerous press releases.  You have an offer

22   memorandum that was on my (inaudible) Bank.  All recognize

23   that it was ASRR who did all the work managing these

24   buildings.

25        That's what we relying on Your Honor.  Thank you.

1                   MR. URGENSON:  Your Honor may I briefly respond,

2       if I may?

3                   THE COURT:  Okay, very shortly, very briefly.

4                   MR. URGENSON:  So, I believe Mr. Korpus has

5       mischaracterizing our argument.  I think that we were

6       saying that it was, the idea that there was eight hundred

7       -- a hundred and eighty million dollars in debt to HSBC and

8       they got paid eight million it was fully contrived.

9             But regardless, I mean, you know you can read the

10      papers and you can obviously make those determinations for

11      yourself.  But one thing I also wanted to clarify was, that

12      two things, despite what they told you Your Honor, about

13      not having the emails, they had the Alan Kahan email and

14      they had the Wechsler since the beginning of this action.

15            Never did they ever even serve a notice of subpoena to

16      Mr. Wechsler, ever.  Despite always having this email.  And

17      also, Mr. Korpus, misrepresented the facts a little bit.

18            What I said was, it wasn't important to have Alex and

19      Rosen be deposed because they have already put forth their

20      affidavits and Mr. Korpus came back to me and he said we'll

21      agree provided that we also don't take Mr. Kahan's

22      deposition.

23            So, we specifically boxed out Mr. Kahan.  And you know

24      despite having that email all along as well, he

25      specifically wanted to avoid the deposition of Mr. Kahan

 1    and we agreed to that.  So, those are the facts.

 2         MR. KORPUS:  We didn't know at that time of affidavit

 3    and Your Honor you have exhibit here, which is the exchange

 4    of Mr. Urgenson, you can see what he says, it simply not

 5    correct.  And let me address the emails really quick

 6    because you're going to go there anyways.

 7         Your Honor it makes no sense that we have these emails

 8    know them and hide them.  If we had known about them, if we

 9    had known we had the emails, we would have used them.  Just

10    as well we used them because the estate never produced

11    them.  Did not produced the Wechsler email, did not produce

12    the Kahan email, thank God we had them.

13         You know it was a mistake, we had no idea, we finally

14    saw a laptop, it was on that, in a very heavy (inaudible),

15    and not only that, we didn't even withhold any privileged

16    document.

17         Unlike the estate which withheld three thousand

18    privileged documents even though Mr. Rosen has owned them.

19    We produced everything, privileged, not privileged, we gave

20    the estate our entire collection.

21         THE COURT:  Okay. Mr. Scott, anything that you

22    would like to add?

23         MR. SCOTT:  Imputed chart – Your Honor on the

24    issues that have been discussed, or addressed by Mr. Korpus

25    and Mr. Urgenson, the answer is no.  But we take a more

1    simplistic view of the issue on this motion, Your Honor.

2    It's fully briefed in our papers.  I prepared a summation

3    of that position. And I'm happy to present it Your Honor.

4    But if Your Honor is fully familiar with the papers, I will

5    spare you.

6         Fundamentally, what our position comes down to is that

7    we support the motion and we believe that it should be

8    granted on one or two grounds or on both grounds.

9         One, is for what Mr. Rosen has said and the second is

10    for what he has not said.  Your Honor need only referred to

11    Mr. Rosen's amended answer dated July eight, two thousand

12    nineteen and his supplemental affidavit dated February

13    seventeenth, two thousand twenty, where he lays out in

14    seriatim fashion, the services rendered by ASRR as a basis

15    for compensation, and compare those services in bullet

16    point fashion with the service, the types of services

17    enumerated in the general obligation's laws, you know

18    5-701a10 and you will find that they are mere image.

19         You know if the general obligation law requires a

20    writing for compensation to negotiate a loan, ASRR

21    negotiated multiple loans in regard to the three properties

22    that are a subject of their services.  Fifty-three Park,

23    Fifty Madison and all that, Fifty (inaudible) eleven

24    Madison.

25         If the general obligation and law requires a writing

1    as a basis for compensation to negotiate a purchase, ASRR

2    negotiated multiple purchases with a respect to each of the

3    properties.  If then the general obligation law requires a

4    writing to negotiate a sale or exchange, ASRR negotiated

5    multiple exchanges with a respect or sales with respect to

6    each of these properties.  The same is true with renting or

7    leasing or precuring the introduction of a party, or

8    negotiating or the consummation of a transaction.

9         Mr. Rosen's answer and his supplemental affidavit

10   recites chapter and verse the very types of services and

11   claims credit for the varies types of services which the

12   general obligations law or the statute of frauds as we

13   refer to it you know require that there be some form of

14   writing as a predicate to -- entitled to compensation.

15        To be sure Mr. Rosen has tried to walk back those

16   representation or his rendition of the services which he

17   claims ASRR performed, and is seeking compensation, but

18   Your Honor, his representation in those two pleadings are

19   unequivocal, unambiguous and are made under oath and under

20   the court of appeals Holding and (inaudible)

21   (telephone ringing) Bunsmond (ph.) it is our position that

22   he has bound by them.  And if he is bound by them the

23   emotion should be granted because the services are simply

24   not compensable in the absence of some form of writing.

25        And my second point that the motion should be granted

1  for what Mr. Rosen doesn't say, or in this case does do.  I

2  raise this issue when we were before Your Honor last in

3  December I believe of two thousand twenty.

4       I find it incredulous, that this you know closely held

5  two-person entity, ASRR, has no record whatsoever of the

6  existence of this one-hundred- and two-million-dollar

7  receivable.  You would think that any entity that was owed

8  a hundred and two million dollars would be carrying that

9  receivable somewhere in its books and records.  Some

10  notation of an account receivable, some mention on a

11  quarterly or annual report in a profit or loss statement on

12  a balance sheet or a statement of assets.  Not anything

13  anywhere, if only to show that the company you know

14  acknowledged or was aware that it was owed this money.

15       To ensure that we had not overlooked something we

16  served Mr. Rosen with a notice to admit.  And in response

17  Mr. Rosen confirmed that that the receivable had never been

18  reported on the books or records of ASRR and that the

19  receivable has never been listed on any financial net worth

20  statements, statement of profit of loss, statement of

21  assets, liabilities or any other document showing ASRR as

22  financial condition.

23       You know we find it patiently incredible Your Honor

24  for Mr. Rosen to assert that ASRR has a claim of a hundred-

25  and two-million dollars against the decedent or the

1     decedent's estate and that ASRR never reported the

2     existence of such account receivable on any financial

3     statement.

4          We also Your Honor find it patiently inconceivable

5     that when Alex Sapir and Mr. Rosen affected a severance of

6     their interest in ASRR, that the alleged claim was never

7     mentioned.

8          Your Honor may recall that Alex Sapir paid

9     seventy-five million dollars to Mr. Rosen to buy out his

10    interest in ASRR and other joint interests with one single

11    exception as I mentioned the last time, of an insurance

12    policy which was specifically referenced in the closing

13    documents as an asset that will be dealt with separately.

14         Yet there's no mention of this one hundred and two-

15    million-dollar receivable which merely equals the record

16    value of the company and the joint interests.

17         When I raised you know this observation before Your

18    Honor, Mr. Korpus as I recall corrected me to say that the

19    separation of interests between Mr. Sapir and Mr. Rosen was

20    not intended to include all of ASRR assets.

21         However, Mr. Korpus filed a document dated December

22    twenty-six, twenty-twenty one, in a federal court action,

23    between Mr. Rosen and Mr. Alex Sapir, titled, Statement of

24    Material Facts as to which there is no actual dispute.

25         There Mr. Korpus stated that pursuant to a binding

1   LOI, letter of intent, Sapir, meaning Alex agreed to

2   purchased Mr. Rosen's entire interest in their joined

3   assets including ASRR for seventy million-dollars which was

4   then increased by approximately five and a half million

5   dollars.

6       So, I close the question again of the separation of

7   interest involved Alex purchasing the hold of Mr. Rosen's

8   interest in ASRR, why there is no mention of that asset in

9   the closing bind or any document associated you know with

10  that transaction as an account receivable.

11      Your Honor, I only mention this because we're all

12  familiar with the road map for briefing a summary judgment

13  motion.  You know once the (inaudible) has made a prima

14  facia showing of entitlement to judgment as a matter of

15  law, the burden shifts to the respondent to produce

16  evidence with proof in admissible forms sufficient to

17  establish the existence of a triable issue of fact and I

18  would submit that Mr. Rosen has failed to meet that burden

19  by not providing a single document or notation.  You know

20  just a scribble for that matter to demonstrate this alleged

21  claim ever existed or that he believed the claim existed.

22      You know, instead you know what we have in the main

23  for Mr. Rosen are his self-serving narrative which falls I

24  believe far short of the quantum proof required to create a

25  triable issue of fact.

1          And that is you know in an abridged version of what my

2      comments would have been today Your Honor and I thank you

3      for your time.

4                  MR. KORPUS:  If I may (inaudible) --

5                  THE COURT:  Thank you.

6                  MR. KORPUS:  -- Your Honor.

7                  THE COURT:  Thank you Mr. Scott.

8                  MR. KORPUS:  Sorry Your Honor?

9                  THE COURT:  No, I just said, thank you Mr. Scott.

10     Mr. Korpus you want to respond?

11                 MR. KORPUS:  Yes please.  Your Honor, Mr. Scott's

12     presentation on the statute of fraud and the work done, we

13     have made a detail, detailed and undisputed showing of all

14     the work that was done and how it satisfies the

15     requirements of Dorfman (ph.) and is in accordance with

16     cases Jeff Capital Advisors and Kopley (ph.) vs. Plan (ph.)

17     in showing that it goes beyond just negotiations.  Mr.

18     Scott in his papers and here today has this view of the

19     statute of fraud that if he touches negotiation its

20     enforceable then he's not no longer, that is not the law in

21     those cases.

22          The law is in Dorfman the court said that just because

23     work is intertwined with work assisting in negotiations

24     consummation of a business opportunity, it is not

25     unrecoverable.

1      And in Kopely (ph.) verses Plan (ph.) the recent case,

2    the court held the statute of fraud did not apply where

3    client provided financial and investment advised that

4    extended over years.  Which is exactly what happened here.

5      And all the work that we've shown, in arboreous detail

6    reviewing and commenting on transaction documents, meeting

7    with attorneys, meeting with counter parties, working on

8    financing, advising, strategizing on how to manage

9    investments, all of that work, attracting tenants, I mean,

10   there's a litany and I can take you through all but I know

11   you know the papers.  That just comes as exception to

12   Dorfman, (ph.) because all the work was done.

13     Now how do we know that work was done?  First of all,

14   it's all in the emails, it's all in the fifteen thousand

15   emails sent by Rotem (ph.) alone, but also it was

16   recognized in press releases on all these big transactions.

17   Recognizing the role of ASRR in managing this property.  It

18   was recognized in the prospectors filed with the SCC, which

19   reference the work done by ASRR.

20     So, it's not that there is no writing, there is

21   writing.  There's even writing, there's even writing with

22   the SCC.  And there is the affidavit by Mr. Wechsler, which

23   I know they dispute.

24     Now let me address the second point which is, why

25   wasn't this in any of the accounts of ASRR, this debt.

1    Because it was a family business, it was Alex and Rotem

2    they were brother in laws at that time and it was the same

3    with the HSBC debt.  That was also never recorded on ASRR

4    receivable on any of the accounts of ASRR.

5        And we know today that the estate acknowledges the

6    debt was a debt that was owed and eventually paid to ASRR

7    for the work done in connection with HSBC.  But it's just

8    the same cause of conduct Your Honor.

9        And finally, Your Honor, in connection with the letter

10   agreement between Alex and Rotem, first of all as argued

11   before its in our papers that had nothing to do with the

12   estate, that was division of joint assets.  Not of ASRR of

13   joint assets.  That's what they were there to do.

14       There's no mention of the hundred- and two-million-

15   dollar debt it because it not a debt, it was owed from Alex

16   to Rotem or Rotem to Alex.  It was nothing to do with that.

17       Now, what he does tell you is that their argument that

18   the release (inaudible) in connection with this joint

19   letter, released the estate cannot be.  Because Mr. Scott

20   argument runs totally contradicted to the estate argument

21   here.

22       Mr. Scott says, it had nothing to do with the hundred

23   and two million dollars, it wasn't even mentioned, then why

24   would it be released.  If Mr. Scott didn't know about it as

25   counsel of the beneficiaries, then he couldn't have

1       released it.  Therefore, the release could the release

2       could not have operated to release that debt.  Thank you

3       Your Honor.

4                    THE COURT:  Thank you.  Okay, I'm assuming no one

5       else is intending to speak today other than those who have

6       spoken.  Okay, give me a few minutes.  We can go off the

7       record.

8  OFF THE RECORD (3:40:53)

9  BACK ON THE RECORD:  3:50:43

10                   THE COURT:  I am going to rule on the Motion

11      today.  The Motion for Summary Judgment in these SCPA-1809

12      proceeding to this amount, the claim asserted on behalf

13      ASRR LLC, against the Estate of Tamir Sapir is granted and

14      the claim is disallowed.

15          The preliminary Executor established a prima facia

16      case of entitlement to judgment as a matter of law with

17      respect to his position that any claim by ASRR is bared by

18      the statute of frauds.

19          In this regard, (inaudible) established that the

20      alleged agreement, pursuant to which claimant seeks

21      compensation involves over all the (inaudible) or lease of

22      real estate and negotiations related to the same.

23          For which general obligations law section 5-701 sub-a,

24      subdivision 10, requires a writing in order to be

25      enforceable.

1     I opposition to the Motion, claimants evidence failed

2     short of creating an issue of material fact requiring a

3     trial.

4          I will issue a decision of course which will be sent

5     to all of you.  Thank you very much.

6               MR. URGENSON:  Thank you Your Honor.

7               MR. KORPUS:  Your Honor, may I ask a

8     clarify question?

9          THE COURT:  Of course.

10              MALE SPEAKER:  Thank you Your Honor.

11              THE COURT:  Of course.

12              MR. KORPUS:  Your Honor I understand your ruling,

13    I remind the Court we also have (inaudible) contractual

14    claims, I wasn't sure whether your ruling on those as well.

15    We have unjust enrichment and one to merit and those

16    claims.  I wasn't sure --

17              THE COURT:  No, yeah --

18              MR. KORPUS:  -- whether the --

19              THE COURT:  -- I will address those in the

20    written decision.

21              MR. KORPUS:  Thank you Your Honor.

22              MR. URGENSON:  Thank you so much Your Honor.

23              THE COURT:  Okay thank you.

24              MALE SPEAKER:  Thank you.

25              THE COURT:  Have a good day.

1  (3:52:55 p.m.) [PROCEEDING CONCLUDED]

2

3

4  CERTIFICATE:  I, Rosie M. Zayas, certify the foregoing

5  transcript of proceedings held at New York County Surrogate's

6  Court, NYS, Estate of Tamir Sapir, File #2014-4683/A, was

7  prepared using the required electronic equipment and is a true

8  and accurate record of the proceedings.

9  Signature:  _Rosie M. Zayas_              Date:  June 11, 2022

10  Electronic signature

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25